UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____X

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

        Plaintiff,

-against-

AKIN GUMP STRAUSS HAUER & FELD LLP,

        Defendant.

_____X

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

        Plaintiff,

-against-

ARENT FOX LLP,

        Defendant.

_____X

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

        Plaintiff,

-against-

DORSEY & WHITNEY LLP,

        Defendant.

_____X

No. 11 civ. 5994 (CM)

No. 11 civ. 5973 (CM)

No. 11 civ. 5995 (CM)

USDS SDN
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11 2 11

1

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,                                                            No. 11 civ. 5969 (CM)

    -against-

DUANE MORRIS LLP,

       Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,                                                            No. 11 civ. 5974 (CM)

    -against-

JONES DAY,

       Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,                                                            No. 11 civ. 5972 (CM)

    -against-

JONES DAY and SCOTT JONES,

       Defendants.

_____x

2

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,                                         No. 11 civ. 5968 (CM)

    -against-

JONES DAY and GEOFFREY DE FOESTRAETS,

      Defendants.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,                                         No. 11 civ. 5970 (CM)

    -against-

JONES DAY and JINGZHOU TAO,

      Defendants.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,                                         No. 11 civ. 5993 (CM)

    -against-

K&L GATES LLP,

      Defendant.

_____x

3

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

           Plaintiff,                      No. 11 civ. 5985 (CM)

      -against-

MORRISON & FOERSTER LLP,

           Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

           Plaintiff,                      No. 11 civ. 5971 (CM)

      -against-

SHEPPARD MULLIN RICHTER
& HAMPTON LLP,

           Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

           Plaintiff,                      No. 11 civ. 5983 (CM)

      -against-

DLA PIPER (US) LLP,

           Defendant.

_____x

4

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,                            No. 11 civ. 5984 (CM)

     -against-

DECHERT LLP,

       Defendant.

_____x

## MEMORANDUM ORDER GRANTING DEFENDANTS' JOINT MOTION TO WITHDRAW THE BANKRUPTCY REFERENCE AND DENYING DEFENDANTS' JOINT MOTION FOR ABSTENTION

McMahon, J.:

## **BACKGROUND**

Before the Court are thirteen related matters arising out of the Chapter 11 bankruptcy petition filed by Coudert Brothers LLP ("Coudert"). Coudert was a limited liability partnership practicing law in New York before its voluntary bankruptcy filing in September 2006. (Decl. of Alder, ¶ 3.)

Plaintiff Development Specialists, Inc. ("DSI") is the Plan Administrator of the Coudert bankruptcy estate. Insofar as is relevant here, it brought thirteen separate adversary proceedings against ten law firms: Defendants Akin Gump Strauss Hauer & Feld LLP, Arent Fox LLP, Dorsey & Whitney LLP, Duane Morris LLP, Jones Day, K&L Gates LLP, Morrison & Foerster LLP, Sheppard Mullin Richter & Hampton LLP, DLA Piper (US) LLP, and Dechert LLP (the "Firms"). (Id., ¶¶ 6-7; Decl. of Huene, Exhs. A, B.)

5

DSI's theory of recovery was that the Firms were liable to Coudert for certain "unfinished business" former Coudert Partners took with them to their new homes at the Firms (the "Unfinished Business Claims"). The Unfinished Business Claims, which are based on New York state partnership and contract law, seek to hold the Firms liable for any fees earned on matters Coudert's former partners brought with them to the Firms. DSI additionally asserts fraudulent conveyance claims under New York's Debtor & Creditor Law against Defendant Dechert. (Decl. of Huene, Exh. B.) All DSI's claims were interposed in late 2008 and 2009, after confirmation of Coudert's liquidation plan.

The Firms moved to dismiss in two groups in January and June 2009. (Decl. of Adler, ¶¶ 10-14.) They argued that the "unfinished business doctrine" in New York applies only to contingency fee cases. For example, if Firm A does 100 hours of work on a contingency basis, then dissolves, and a departing partner takes that case with her to Firm B, where it yields a large settlement, Firm B may be liable to Firm A's liquidation estate, under the "unfinished business doctrine," for the value of the 100 hours of previous work on the case. See, e.g., Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 297-298 (2d Cir. 2000) (applying New York law). The Firms argued that the doctrine rests on principles of quantum meruit, compensating the dissolved Firm A for the value of work actually performed toward generating the settlement for Firm B.

However, the Firms argued, the doctrine does not extend to cases where the client is required to pay for service rendered on an hourly basis, rather than having no obligation to pay unless a favorable result is achieved. Thus, the Firms argued, if Firm A bills 100 hours on a case, and a partner then takes that case to Firm B and bills another 100 hours on it, Firm A's bankruptcy estate is not entitled to anything except payment from the client (not firm B) for the 100 hours of work firm A performed on the client's behalf. Firm B has no liability to the estate,

6

because hourly fees generated by the work performed by the departed partner and his colleagues after the move to Firm B are entirely attributable to work done at Firm B. The Firms therefore sought dismissal of DSI's claims to the extent they sought profits earned on hours billed after Coudert dissolved and its partners went their separate ways.

An all day hearing was held on the motions on July 31, 2009; on August 7, 2009 the Bankruptcy Court (Drain, J.) denied the motions to dismiss in a bench ruling. (Decl. of Adler, Exhs. 4, 5.) Judge Drain acknowledged that the application of the unfinished business doctrine to non-contingency cases has not been addressed in New York. Given the lack of clarity regarding the doctrine more generally, Judge Drain observed, "[I]f I had the power, this would be a case for certification to the New York Court of Appeals; however, the New York Constitution precludes that course except for requests by the Second Circuit." (Decl. of Adler, Exh. 5, at 35.)

Nevertheless, relying on authority from other jurisdictions – which, like New York, base their partnership law on the Uniform Partnership Act – Judge Drain concluded that New York's highest court would, if faced with the issue, allow a claim to proceed for unfinished business, even for non-contingency cases. (Id. at 35-42.) In doing so, he rejected the Firms' argument that the doctrine is essentially based on quantum meruit principles. Rather, Judge Drain found that liability follows from a partner's continuing duties to her former firm, including the duty to account for profits earned as a result of the dissolved firm's former business – profits that could be attributed in part to the work done while the partner was at the now-defunct former firm (Id. at 42-51.) As will be seen, the merits of Judge Drain's decision are not before the Court on this motion.

In late 2009 and early 2010, the Firms filed answers to DSI's complaints. (See Decl. of Adler, Exhs. 6-15.) In them, the Firms other than Dorsey & Whitney denied or refused to

7

respond to each complaint's legal conclusion that the proceedings qualified as "core" under 11

U.S.C. § 157. (See S.D.N.Y. Bnkr. Case No. 06-12226, Docket No. 983, ¶ 13, also available at

Adv. Case No. 08-1492, Docket No. 1, ¶ 13 (DSI's complaint against Dorsey, alleging "core"

jurisdiction); Decl. of Adler, Exh. 8, ¶ 13 (Dorsey & Whitney's answer, admitting foregoing

allegation).)[1]  Among the Firms, only DLA Piper asked for a jury trial of all matters so triable.

(See Decl. of Adler, Exh. 14, pg. 10.)

     An amended bench ruling superseded the original decision in January 2010.  After it was

entered the Firms moved for direct certification of the issue to the Second Circuit Court of

Appeals under 28 U.S.C. § 158(d)(2), on the basis that New York law on the issues raised was

unsettled. (Decl. of Adler, Exh. 16.)  Judge Drain denied the motion. (Id., Exh. 17, at 31-44.)

The Honorable Victor Marrero, of this Court, subsequently denied the Firms' motion for leave to

appeal Judge's Drain's non-final order denying the motion to dismiss the complaints:

> The Court is not persuaded that the Orders present a controlling issue of law, that an
> interlocutory appeal would terminate the Adversary Proceedings or advance their
> termination, or that there is substantial ground for difference of opinion on the questions
> presented.  Moreover, even if the Law Firms could satisfy § 1292(b), the Court would
> exercise its discretion to deny leave to appeal because, in the Court's view of the record,
> this case does not present exceptional circumstances to depart from the final judgment
> rule.

In re Coudert Bros. LLP Law Firm Adversary Proceedings, 447 B.R. 706, 712 (S.D.N.Y. 2011).

     On June 23, 2011 the United States Supreme Court issued its decision in Stern v.

Marshall, 131 S.Ct. 2594 (2011), the import of which is discussed below.  Shortly thereafter, the

Firms asked this Court to withdraw the bankruptcy reference, and either to abstain from hearing

---

[1]      This is contrary to the Firms' assertion in their briefs that, "In their answers, *none* of the Law Firms
Defendants agreed with DSI's allegation that the actions were 'core' and thus subject to final determination in the
Bankruptcy Court," Firms' Reply, at 4, and that "None of them admitted DSI's allegation that these Actions are
"core." Firm's Br. at 2 n.3.

the Unfinished Business Claims in favor of the New York state courts or to review the merits of

Judge Drain's ruling *de novo*.

## DISCUSSION

### A. Motion to withdraw the reference

The United States District Court has original jurisdiction over matters "related to" a case

arising under the Bankruptcy Code. 28 U.S.C. § 1334(b). In the Second Circuit, "a civil

proceeding is related to a title 11 case if the action's outcome might have *any conceivable effect*

on the bankrupt estate." Parmalat Capital Finance Ltd. v. Bank of America Corp., 639 F.3d 572,

579 (2d Cir. 2011) (internal quotation marks omitted) (emphasis added). The parties agree, and

this Court finds, that the captioned proceedings are "related to" the Coudert bankruptcy estate

that they augment for the benefit of all creditors. See Retired Partners of Coudert Brothers Trust

v. Baker & McKenzie LLP (In re Coudert Bros. LLP), 2011 U.S. Dist. LEXIS 110425, at *35-39

(S.D.N.Y. Sept. 22, 2011). Therefore, this Court has jurisdiction over what would otherwise be a

state court matter.

Under 28 U.S.C. § 157, the § 1334(b) jurisdiction is exercised by both the District Court

and the Bankruptcy Court, depending on the nature of the proceedings. Bankruptcy Judges have

the authority to "hear and determine" all so-called "core" proceedings "arising under title 11."

With respect to those, a Bankruptcy Judge "may enter appropriate orders and judgments," subject

only to deferential review. See 28 U.S.C. §§ 157(b)(1), 158. With respect to non-core claims, by

contrast, the Bankruptcy Court can only make recommended findings of fact and conclusions of

law, subject to *de novo* review in District Court, which then exercises final adjudicative power.

28 U.S.C. § 157(c)(1) and (2).

9

In this District, "Pursuant to Section 157(a) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, any or all cases under title 11 and any or all proceeding arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for the district." Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.). In other words, all proceedings related to a bankruptcy case, whether core or non-core, are automatically referred to the Bankruptcy Court in the first instance.

The question presented by the Firms' motion to withdraw the reference is whether these cases should stay in Bankruptcy Court or proceed instead before this Court. Under 28 U.S.C. § 157(d), a "district court may withdraw . . . any case or proceeding referred [to the Bankruptcy Court] on its own motion or on a timely motion of any party, for cause shown." In the Second Circuit, courts evaluate whether "cause" is shown by looking to, among other things, the following factors: "whether the claim or proceeding is core or non-core . . . considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law." In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993) (collecting cases).

In Orion, the Second Circuit instructed that:

> A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn. For example, the fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court. Conversely, hearing core matters in a district court could be an inefficient allocation of judicial resources given that the bankruptcy court generally will be more familiar with the facts and issues. Thus once a district court makes the core/non-core determination, it should weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors.

Id.; see also In re The VWE Group, Inc., 359 B.R. 441 (S.D.N.Y. 2007) (McMahon, J.).

However, the Supreme Court's recent decision in Stern v Marshall establishes that identifying a claim as "core" or "non-core" under the bankruptcy law does not necessarily determine whether a bankruptcy court is constitutionally empowered to finally adjudicate the matter. In Stern, the Supreme Court held that the Bankruptcy Court's power to enter final judgments on matters is not co-extensive with what the statute considers "core;" some matters considered core cannot be finally adjudicated in the Bankruptcy Court where they involve only private rights that will not necessarily be determined in ruling on a proof of claim filed against the estate, unless all the parties consent. See generally Stern, 131 S.Ct. at 2594.

As will be seen, however, the Orion standard – developed under the assumption that final adjudicative authority exists over "core" matters – is easily adapted to the lessons of Stern.

### 1. *Stern, and its impact on the Orion factors*

To understand Stern's impact on this case, it is necessary to appreciate an even older case, Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) ("Marathon"). In Marathon, the Supreme Court struck as unconstitutional the 1978 Bankruptcy Act's effort to vest final adjudicative authority over certain matters in the Bankruptcy Court. More particularly, at issue in Marathon were state law counterclaims filed by Northern Pipeline, a debtor in bankruptcy, against Marathon, a third party.

The Supreme Court's decided that Article III of the constitution required that final adjudicative authority matters within the competence of the Article III judiciary be vested there, and not removed to tribunals where judges lacked the essential Article III protections of life tenure and non-diminution of salary. To protect that independence, the Marathon plurality suggested that Congress could only remove controversies from Article III courts in three

11

circumstances. The first two, involving territorial and military courts, are not implicated here. The third situation in which a non-Article III tribunal may finally determine a matter is when it involves what is termed a "public right." Marathon, 458 U.S. at 67-70. Speaking loosely, public rights are: (1) rights created by federal law, to which the political branches are free to attach conditions; (2) claims tied up inextricably with such rights; or (3) "matters that historically could have been determined exclusively by the Executive and Legislative Branches." See Stern, 131 S.Ct. at 2611-613 (internal quotation marks and citation omitted). "The Court has continued . . . to limit the [public rights] exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority. . . . [W]hat makes a right 'public' rather than private is that the right is integrally related to particular federal government action." Id. at 2614.

Northern Pipeline's counterclaims against Marathon did not implicate any public right: they were brought under state law, and they would and could not be disposed of by ruling on any claims against the bankruptcy estate. The Supreme Court therefore concluded that those counterclaims could not be finally determined by a non-Article III tribunal.

In doing so, the plurality acknowledged that the bankruptcy discharge – a Congressionally created right to relief – might qualify as a "public right," and so subject to final determination in a non-Article III tribunal. But it distinguished this "core" public right from matters, like the purely state law claims at issue, that were peripheral to the discharge itself:

> Appellants argue that a discharge in bankruptcy is indeed a "public right," similar to such congressionally created benefits as "radio station licenses, pilot licenses, or certificates for common carriers" granted by administrative agencies. But the restructuring of debtor-creditor relations, *which is at the core of the federal bankruptcy power,* must be distinguished from the adjudication of state-created private rights, such as the right to

12

recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not.

Marathon, 458 U.S. at 71-72 (internal citations omitted) (emphasis added).

After Marathon, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984. The 1984 Act divided the proceedings before the Bankruptcy Court into "core" and "non-core" proceedings, and, as discussed above, gave Bankruptcy Judges final adjudicative power of "core" matters, while limiting them to issuing recommendations in "non-core" matters. See In re S.G. Phillips Constructors, Inc., 45 F.3d 702, 704-705 (2d Cir. 1995). This division was intended to move final adjudicative authority over proceedings involving "public rights" to the Article I Bankruptcy Court, while retaining matters not at the "core" of the Congressionally created right to a bankruptcy discharge to the Article III courts, at least for final determination. See Stern, 131 S.Ct. at 2610-611; see also 28 U.S.C. § 157(b)(2) (listing examples of "core" proceedings). "Congress realized that the Bankruptcy Court's jurisdictional reach was essential to the efficient administration of bankruptcy proceedings and intended that the 'core' jurisdiction would be construed as broadly as possible subject to the constitutional limits established in Marathon." In re S.G. Phillips, 45 F.3d at 705.

What the Supreme Court held in Stern was that Congress did not altogether succeed in achieving its goal: some claims, while denominated "core" under the statute, nonetheless implicate only private rights, which cannot be finally adjudicated in a Bankruptcy Court consistent with Article III.

In Stern the heir to a fortune, Pierce, sued his deceased father's (bankrupt) third-wife, Vickie,[2] in the Bankruptcy Court, for defamation. After Vickie's untimely death, her estate

---

[2] "Vickie" was more widely known by her "stage" name, Anna Nicole Smith.

counterclaimed against Pierce for tortious interference with a prospective gift – a claim based on Texas state law. The Bankruptcy Court adjudicated that counterclaim in Vickie's favor. Pierce subsequently argued, among other things, that the Bankruptcy Court lacked constitutional authority finally to adjudicate Vickie's counterclaim, whether or not it was denominated "core" under the 1984 Act. See generally Stern, 131 S.Ct. at 2601-603.

The Supreme Court held that the counterclaim was "core" under the plain language of the statute, and so fell squarely within the adjudicative authority that Congress intended to confer on the Article I Bankruptcy Court. Id. at 2604-605; see also 28 U.S.C. § 157(b)(2)(C) ("Core proceedings include . . . counterclaims by the estate against persons filing claims against the estate."). However, the Court held that Article III precluded the Bankruptcy Court from finally determining the counterclaim, because it involved only "private rights."

After examining its precedents on what constitutes a public rather than a private right, see Stern, 131 S.Ct. at 2611-614, a majority of the Supreme Court concluded as follows:

> Vickie's counterclaim . . . does not fall within any of the varied formulations of the public rights exception in this Court's cases. It is not a matter that can be pursued only by grace of the other branches, or one that "historically could have been determined exclusively by" those branches. The claim is instead one under state common law between two private parties. It does not "depend[ ] on the will of congress"; Congress has nothing to do with it.
>
> In addition, Vickie's claimed right to relief does not flow from a federal statutory scheme. It is not "completely dependent upon" adjudication of a claim created by federal law. And . . . Pierce did not truly consent to resolution of Vickie's claim in the Bankruptcy Court proceedings. He had nowhere else to go if he wished to recover from Vickie's estate.
>
> Furthermore, the asserted authority to decide Vickie's claim is not limited to a "particularized area of the law." We deal here not with an agency but with a court, with substantive jurisdiction reaching any area of the corpus juris. This is not a situation in which Congress devised an "expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to

14

that task." The "experts" in the federal system at resolving common law counterclaims such as Vickie's are the Article III courts, and it is with those courts that her claim must stay.

Id. at 2614-615 (citing Murray's Lessee, 59 U.S. at 272; Ex parte Bakelite Corp., 279 U.S. 438 (1929); Crowell v. Benson, 285 U.S. 22 (1932); Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n, 430 U.S. 442, 458 (1977); Marathon, 458 U.S. at 50; Thomas v. Union Carbide Agr. Products Co., 473 U.S. 568 (1985); Commodity Futures Trading Com'n v. Schor, 478 U.S. 833 (1986); Granfinanciera S.A. v. Nordberg, 492 U.S. 33 (1989)).

Before Stern, courts (including the Second Circuit) were accustomed to resolving whether the Bankruptcy Court could finally adjudicate a given claim by asking whether or not it could be considered "core" under 28 U.S.C § 157. In other words, it was assumed that Congress had succeeded in identifying as "core" proceedings only those affecting "public rights," so all "core" proceedings fell within the final adjudicative power of the Article I Bankruptcy Court.

However, Stern held that the constitutional question was not congruent with the text of the statute. What matters for Article III purposes – and so the question that must be asked whenever a party challenges the Bankruptcy Court's authority to make final adjudications – is whether the claim to be adjudicated involves a "public" or a "private" right. If the claim involves private rights, Congress cannot vest final adjudicative power over it in the Bankruptcy Court consistent with Article III, whether the claim is "core" or "non-core". Stern, 131 S.Ct. at 2594; Marthon, 458 U.S. at 50.

As noted above, on a motion to withdraw a bankruptcy reference, the Orion test looks first to the core/non-core distinction in order to determine the advantages and disadvantages of leaving a matter before the Article I court or moving it to an Article III court. See Orion, 4 F.3d at 1101. But, as a practical matter, those advantages and disadvantages depend first on the

Bankruptcy Court's power to enter final adjudications, and after Stern, that power depends, not on whether the matters are core or non-core, but on whether the rights being adjudicated (1) are public rights, or (2) will necessarily be resolved in ruling on a creditor's proof of claim – or, of course, on the parties unanimously consenting to bankruptcy court adjudication.

So after Stern, one can still apply the Orion but not looking at whether the matter can be classified as "core" under 28 U.S.C. § 157, but rather at whether, under Stern, the Bankruptcy Court has the final power to adjudicate it. If it does not have that power, there will be no advantage to allowing the matter to be heard in Bankruptcy Court, because this Court will eventually need to review the Article I Court's determinations *de novo* review – i.e., as the statute would have them treated if they were "non-core."[3]  Thus, where the Bankruptcy Court lacks final adjudicative authority, the remaining Orion considerations will often tend to point toward withdrawal, for the same reasons they did when the question asked was whether or not the actions were core:

> For example, the fact that a bankruptcy court's determination on [private rights] matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court.  Conversely, hearing [matters within the Bankruptcy Court's final adjudicative authority] in a district court could be an inefficient allocation of judicial resources given that the bankruptcy court generally will be more familiar with the facts and issues.  Thus once a district court makes the [determination whether the matter at issue can be finally adjudicated in Bankruptcy Court or not], it should weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors.

Orion, 4 F.3d at 1101.

---

[3]      This Court recently found that reviewing *de novo* determinations of the Bankruptcy Court in "core" matters that nevertheless involve private rights best effectuates the Congressional intent behind the 1984 Act, as well as the Supreme Court's admonition in Stern that the division of labor between the District Court and the Bankruptcy Court should be disturbed as little as possible. See Retired Partners, 2011 U.S. Dist. LEXIS 110425, at *35-41.

### 2. *Timeliness of the withdrawal motion*

DSI argues that, regardless of the Orion factors, the motion to withdraw the reference should be denied because it is made too late. I disagree.

"There is no specific time limit for applications under 28 U.S.C. § 157(d) to withdraw a reference to the bankruptcy court. In this Circuit, however, courts have defined 'timely' to mean as soon as possible after the moving party has notice of the grounds for withdrawing the reference." VWE Group, 359 B.R. at 446 (internal citations, quotation marks and alterations omitted). Moreover, "the timeliness standard is flexible and case-specific and must be administered in a manner that fosters the efficient and fair resolution of disputes." In re Enron Creditors Recovery Corp., 410 B.R. 374, 381 n.9 (S.D.N.Y. 2008).

DSI argues that insofar as its proceedings against the Firms have been pending in Bankruptcy Court for three years, this motion cannot be timely. The Firms, meanwhile, rely on Stern, arguing that it so changed the legal landscape that it provided the first plausible basis for their joint motion. In addition, they point out that although DSI's action was filed three years ago, very little litigation has actually occurred. There has been no discovery, no summary judgment motion, and no trial.

In light of Stern, this motion is timely.

DSI argues that the Firms should have moved to withdraw the reference in late 2008 and early 2009, because all of them (except one) took the position that the claims against them were non-core. However, prior to Stern, the Firms had only a tenuous basis for withdrawal. DSI's complaints generally relied on 28 U.S.C. § 157(b)(2)(E) and (O), which provide, respectively, that core proceedings include: "orders to turn over property of the estate" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor creditor . . .

17

relationship, except personal injury tort or wrongful death claims." To the extent the Unfinished Business Claims seek to determine whether the hours billed by former Coudert partners after they affiliated with new firms were "property of the estate," there was a strong argument that the Claims should be considered "core" under the statute. To the extent the Firms recognized this, and therefore decided not to make a motion for withdrawal, they (and others in their situation) should not be punished now that the Supreme Court has clarified the law.

Following Stern, however, the flaw in the Firms' statutory argument for withdrawal became irrelevant in light of the strength of their constitutional argument. DSI tries to downplay the significance of Stern, casting it as a mere continuation of Marathon and Granfinanciera, where the Supreme Court held that, although a fraudulent conveyance counterclaim could be classified as "core" under the statute, because it involved only private rights, the party against who it was asserted was entitled to a jury under the Seventh Amendment. 492 U.S. at 33. DSI cites this case to prove that, even before Stern, the statutory jurisdictional issue diverged from the constitutional issue whether Article I courts can finally determine particular matters.

However, Stern goes further than both those cases. Marathon commanded only a plurality, and its analytic approach had not been consistently applied. See, e.g., Thomas, 473 U.S. at 578; Schor, 478 U.S. at 833. Stern represents the first time a solid majority of the Supreme Court has applied the categorical, historical approach to limit the final adjudicative authority of the Bankruptcy Court following the 1984 Act. Granfinanciera, meanwhile, was explicit in limiting its holding to the Seventh Amendment issued presented – it left open the issues decided in Stern: "We do not decide today whether . . . the Seventh Amendment or Article III allows jury trials in [fraudulent conveyance, private right] actions to be held before non-Article III bankruptcy judges subject to the oversight provided by the district courts pursuant to

the 1984 Amendments." Granfinanciera, 492 U.S. at 64. Only in Stern did the Court actually hold that a fraudulent conveyance action implicating private rights must be finally determined in an Article III forum.

Finally, as then-District Judge Lynch has observed, "If [a party seeking withdrawal] were correct in any of its arguments, rejection of the motion on grounds of timeliness would compromise substantive rights or generate inefficiencies. The motion to withdraw the reference should be decided on its merits." Enron, 410 B.R. at 381 n.9.

Thus, the timeliness of this motion should be evaluated by looking to how promptly the Firms moved for withdrawal following Stern. On this premise, I believe even DSI concedes the motion is timely. The Firms and DSI entered discussions on Stern's impact shortly after it was issued. When it became clear they could not agree on whether the reference should be withdrawn, the Firms promptly moved this Court for relief. See Decl. of Huene, at ¶¶ 4-9.

Thus, I conclude that the motion is timely, and turn to the application of the Orion factors.

### 3. Application of the Orion factors

#### a  Whether the matter is one over which the Bankruptcy Court can constitutionally exercise final adjudicative authority

The primary factor in deciding a motion to withdraw is whether or not the Bankruptcy Court has the authority to finally determine the Unfinished Business (and fraudulent conveyance) Claims. See supra. DSI argues that it does have that power – but not because the rights at issue here are "public rights." DSI wisely eschews that argument because its right to recover, if any, does not depend on any federal statute or scheme, but on state partnership and contract law.

19

These rights exist prior to and independent of any bankruptcy proceedings. Nor will the claims necessarily be determined in resolving any proofs of claim filed against the estate. Only Dechert filed a proof of claim in Coudert's bankruptcy, and ruling on that proof of claim will not resolve all the Claims against Dechert, let alone all the Claims against the other nine firms. Meanwhile, DSI's fraudulent conveyance counterclaim against Dechert is precisely the kind of claim found to involve only private rights in Granfinanciera. See also Retired Partners, 2011 U.S. Dist. LEXIS 110425, at *20-27.

Lacking any argument that the claims in these proceedings involve public rights or will necessarily be resolved in the claims allowance process, DSI is left to argue that Judge Drain could constitutionally enter a final order in this matter because the Firms consented to his doing so.

As discussed above, the 1984 Bankruptcy Act vested final adjudicative power over "core" matters in Bankruptcy Court, and allowed it to make recommendations only in "non-core" matters. See 28 U.S.C. § 157. However, § 157 also provides that a Bankruptcy Judge may finally adjudicate a non-core matter if the parties consent to such adjudication. "Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a Bankruptcy Judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title." Id. § 157(c)(2). Such consent could either be express or implied. See, e.g., In re Men's Sportswear, Inc., 834 F.2d 1134, 1137-138 (2d Cir. 1987); In re Millenium Seacarriers, Inc., 419 F.3d 83, 98 (2d Cir. 2005); In re Tyson, 433 B.R. 68, 77 (S.D.N.Y. 2010); cf. Roell v. Withrow, 538 U.S. 580 (2003) (implying consent to final determination by a

Magistrate Judge). However, where a jury right is asserted, any consent to final adjudication in Bankruptcy Court must be express. See 28 U.S.C. § 157(e).

Stern confirmed that consent can be a sufficient basis for Article I final adjudication: "Section 157 allocates the authority to enter final judgment between the Bankruptcy Court and the district court. See §§ 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction. See § 157(c)(2) (parties may consent to entry of final judgment by Bankruptcy Judge in non-core case)." Stern, 131 S.Ct. at 2608.

The Supreme Court held in Stern that Pierce did, in fact, consent to have his defamation action – which he submitted as a proof of claim against the estate – finally resolved by the Bankruptcy Court. Pierce had made several statements to the effect that he was happy to have, and preferred to have, the Bankruptcy Court decide that claim. Only after he lost did he raise the issue of the Bankruptcy Court's adjudicative authority. Id. at 2607-608. The Supreme Court held that this course of conduct constituted consent:

> Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary). We have recognized "the value of waiver and forfeiture rules" in "complex" cases, and this case is no exception. In such cases, as here, the consequences of "a litigant . . . 'sandbagging' the court – remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor – can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so – and said so promptly. Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad.

Id. at 2608 (internal citation omitted).

At the same time, the Supreme Court held that Pierce did not "truly consent" to having

*Vickie's counterclaim* for tortious interference finally determined by the Bankruptcy Court. Id. at

2614-615.

21

The apparent tension between these holdings is resolved when one recognizes that the

Court's consent holdings flow from its broader holding that the Bankruptcy Court may adjudicate

not only public rights, but also any private rights that will be *necessarily resolved* in ruling on a

creditor's proof of claim. Having submitted a proof of claim based on defamation and having

failed to demand an Article III forum for final determination, Pierce consented to have the

Bankruptcy Court finally adjudicate, not only the defamation claim, but all issues – state law or

otherwise – that necessarily would be resolved in ruling on the defamation claim.

However, the Supreme Court determined that Vickie's counterclaim for tortious

interference with a gift *would not* be completely resolved in ruling on the defamation proof of

claim. It therefore concluded that Pierce's consent to Article I adjudication on the defamation

claim did not necessarily extend to her counterclaim:

> In ruling on Vickie's counterclaim, the Bankruptcy Court was required to and did make
> several factual and legal determinations that were not "disposed of in passing on
> objections" to Pierce's proof of claim for defamation, which the court had denied almost a
> year earlier. There was some overlap between Vickie's counterclaim and Pierce's
> defamation claim that led the courts below to conclude that the counterclaim was
> compulsory, or at least in an "attenuated" sense related to Pierce's claim. But there was
> never any reason to believe that the process of adjudicating Pierce's proof of claim would
> necessarily resolve Vickie's counterclaim.

Id. at 2617 (internal citation omitted). In the absence of other evidence of express or implied

consent to the Bankruptcy Court's adjudication of those independent private rights, the Supreme

Court concluded that there was no basis to sustain the Bankruptcy Court's exercise of jurisdiction

on consent.

Here, DSI argues that the Firms consented to final adjudication of the Unfinished

Business Claims before Judge Drain, either expressly or implicitly. I disagree.

22

First, DSI argues that Dechert "consented" to final adjudication in Bankruptcy Court when it stated in its answer that the Bankruptcy Court had "jurisdiction" under 28 U.S.C. §§ 157, 158, 959(a) and 1334. See Decl. or Adler, Exh. 15 ¶ 38. However, Stern makes clear that the issues of jurisdiction and final adjudicative power are distinct. See 131 S.Ct. at 2607-608. Consenting to jurisdiction – which everyone agrees the Bankruptcy Court possesses under the "related to" doctrine enshrined in 28 U.S.C. § 1334 – is not the same as consenting to the entry of a final determination by a non-Article III tribunal, even if Dechert could have "knowingly and voluntarily" foregone a right to such adjudication on statutory "core" matters before Stern.

DSI next relies on requests by two of the Firms, Defendants Duane Morris and Sheppard Mullin, that the Bankruptcy Court enter "judgment" dismissing the adversary proceedings. But substantial rights should not be made to depend on how a party phrases its boiler-plate prayer for relief – particularly when it is borne in mind that before Stern, the Firms had little reason to believe their argument meant that Judge Drain was not constitutionally empowered to enter "judgment" dismissing DSI's claims. If DSI is going to show real consent to Article I final adjudication, it will need to do better than this. Compare In re Olde Prairie Block Owner, LLC, --- B.R. ----, 2011 WL 3792406, at *2 (Bnkr. N.D. Ill. Aug. 25, 2011), where "Pursuant to Rules 7008(a) and 7012(b) Fed. R. Bankr. P., the parties expressly consented in their pleadings to entry of final judgments by a Bankruptcy Judge on all of Debtor's counterclaims, even if any were determined to be non-core matters."

DSI next relies on the Firms' efforts to obtain review of Judge Drain's ruling, including their attempt to have him certify the issue to the Second Circuit and moving Judge Marrero to hear an interlocutory appeal. It eludes this Court how trying to go over Judge Drain's head evidences consent to litigate to final judgment before Judge Drain. But, for much the same

23

reason that I find this withdrawal motion timely, I doubt whether the Court could infer from the
Firms' pre-Stern litigation conduct a "knowing and voluntary" relinquishment of rights to an
Article III decision-maker.  Where, as here, the statutory argument that the proceedings are non-
core is questionable, a responsible attorney might well not have moved for withdrawal of the
reference under Orion, and would have otherwise lacked a legal basis to contest the case
proceeding before the Bankruptcy Court.  Such a failure to protest should not therefore count
against the client when the Supreme Court changes the basis for applying the withdrawal
analysis, whether the issue is "timeliness" or consent to Bankruptcy Court final adjudication.  In
either case, a waiver of important rights should only be found where it is fully knowing.

       The case is distinguishable from those cases where significant proceedings have already
taken place.  As the Firms point out, in every case DSI cites as supporting a finding of implied
consent to Bankruptcy Court adjudication (all pre-Stern), a party sought withdrawal only after
losing at trial, or in some other substantial proceeding.  Where a party participates in extensive
litigation without raising an argument of which it was aware, it would be unfair and inefficient to
allow that party to escape the consequences of its knowing silence. See, e.g., Men's Sportswear,
834 F.2d at 1137-138; cf. Roell, 538 U.S. at 590-591.  But here, where the Firms raised their
issue when they learned of it, concerns with "sandbagging" are considerably less acute.

       Thus, I conclude that Stern provided the Firms with a legal basis to contest the
Bankruptcy Court's adjudicative power that they did not have before last summer.  For that
reason, the Firms should not be found to have consented to final adjudication in the Bankruptcy
Court.

       Thus, the Bankruptcy Court will not be able to finally adjudicate DSI's claims against the
Firms under Stern.  I will analyze the remaining withdrawal factors with this conclusion in mind.

24

### b. Efficiency

Withdrawal will promote judicial economy. Because the Bankruptcy Court is not able to finally determine these proceedings without the consent of the Firms – which does not appear to be forthcoming – any recommendations it makes will need to be reviewed *de novo* in this Court. It would be inefficient to allow these proceedings to go forward, knowing that they will have to be substantially repeated.

In addition, Defendant DLA Piper has demanded a jury trial of all issues so triable. Decl. of Adler, Exh. 14. Therefore, its action must be finally adjudicated here. "Under Orion, the court's finding that the claim is [not subject to final adjudication in Bankruptcy Court] coupled with defendants' jury demand is sufficient cause to withdraw the reference," the proceedings against DLA Piper at least will be withdrawn. VWE Group, 359 B.R. at 451; 28 U.S.C. § 157(e) (where a jury right is asserted, consent to Bankruptcy Court final adjudication must be express). To the extent that DLA Piper's case raises issues identical to those that would be raised in the other cases, it would be a waste of judicial resources to allow the actions to proceed separately.

Finally, as no discovery has taken place, and no case management plan or other course of proceeding has been agreed on, bringing the actions before this Court will not cause undue delay or require any duplication of effort. And because only issues of law have been presented in the case so far, Judge Drain's familiarity with the underlying facts does not weigh in favor of retention of the case before him.

### c. Uniformity

Withdrawal will not interfere with the uniform administration of the bankruptcy law. DSI's claim to a portion of the non-contingency case fees earned by former Coudert partners at their new firms after Coudert declared bankruptcy, are creatures of state law, not federal

bankruptcy law. Their resolution will at most have the effect of augmenting the bankruptcy estate; it will have no impact that would require uniform, coordinated adjudication before the Bankruptcy Court. Nor does the Bankruptcy Court have any special expertise in resolving the New York law claims at issue here.

### d. Forum-shopping; conclusion

Finally, insofar as the Firms are entitled to have their dispute, which implicates only private rights, finally determined in this Court, the Court does not condone forum shopping by allowing them to come here sooner rather than later. It is true that by doing so, the Firms may avoid an adverse ruling. However, because this Court would have to review Judge Drain's conclusions of law *de novo* were the case left in the Bankruptcy Court (see above), there is no reason not to do now what must be done eventually.

As discussed above, the analysis would be different if Stern had not clarified the inability of the Bankruptcy Court to finally determine the issues in these adversary proceedings without the parties' consent. Absent Stern, the Firms' motion could and probably would be denied. But both the fact that Stern changed things and the way that it did so makes withdrawal appropriate in these cases.


### B. Motion to Abstain

The request for abstention is denied.

First, this Court has subject matter jurisdiction over these proceedings under 28 U.S.C. § 1334(b), because their resolution will have at least some impact on the Coudert bankruptcy estate – for example by bringing funds back into it, or by extinguishing potential liabilities against it.

26

See Parmalat, 639 F.3d at 579; Retired Partners, 2011 U.S. Dist. LEXIS 110425, at *35-39. Thus, abstention (or dismissal) is not required for any jurisdictional reason.

To the extent the Firms claim to seek a speedy, final resolution of the merits issue in this case – whether New York law recognizes the unfinished business doctrine in the context of cases billed by the hour – I find their claim disingenuous. Assuming the issue is as novel and as difficult as the Firms say it is – an assertion already rejected by Judge Marrero, and one on which this Court expresses no as yet – final resolution before this Court, appealed to the Second Circuit, is likely to reach the New York Court of Appeals just as quickly as would a brand new proceeding in New York State Supreme Court, followed by an appeal to the Appellate Division and a petition for leave to appeal to the New York Court of Appeals (which might decide not to take the case).

The motion to abstain gained no additional support from the intervening Stern decision. The state law Unfinished Business Claims are no more "novel" or "difficult" now than they were three years ago, when DSI first filed them in Bankruptcy Court. The Firms offer no justification for a three year delay in seeking abstention.

I therefore conclude that abstention would not be "in the interest of justice" in this case. Nor is it required in the interests of comity or respect for New York law. 28 U.S.C. § 1334(c). The Firms' motion for abstention is therefore denied.

27

## CONCLUSION

The motion to withdraw the reference is granted. Although the Court will not conduct an appeal-like review of Judge Drain's decision, the Firms are free to move for summary judgment on any potentially dispositive legal issues, and to include reference to legal materials not presented before Judge Drain bearing on the state law issues in the case. Should they choose to do so, papers should be filed no later than December 1, 2011; any opposition must be filed two weeks later; and any reply one week after that.

The motion to abstain is denied.

The Clerk of the Court is directed to close the motion at Docket No. 1 in each of the proceedings captioned above.

Dated: November 2, 2011

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

28