UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,

   -against-

AKIN GUMP STRAUSS HAUER & FELD LLP,

      Defendant.
_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,

   -against-

ARENT FOX LLP,

      Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,

   -against-

DORSEY & WHITNEY LLP,

      Defendant.

_____x

No. 11 civ. 5994 (CM)

No. 11 civ. 5973 (CM)

No. 11 civ. 5995 (CM)

USDS SDN.
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/24/12

1

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,               No. 11 civ. 5969 (CM)

     -against-

DUANE MORRIS LLP,

       Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,               No. 11 civ. 5974 (CM)

     -against-

JONES DAY,

       Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

       Plaintiff,               No. 11 civ. 5972 (CM)

     -against-

JONES DAY and SCOTT JONES,

       Defendants.

_____x

2

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,                      No. 11 civ. 5968 (CM)


     -against-

JONES DAY and GEOFFREY DE FOESTRAETS,

      Defendants.

_____x
DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,                      No. 11 civ. 5970 (CM)


     -against-

JONES DAY and JINGZHOU TAO,

      Defendants.

_____x
DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

      Plaintiff,                      No. 11 civ. 5993 (CM)


     -against-

K&L GATES LLP,

      Defendant.

_____x

3

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

        Plaintiff,                              No. 11 civ. 5985 (CM)

       -against-

MORRISON & FOERSTER LLP,

        Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

        Plaintiff,                              No. 11 civ. 5971 (CM)

       -against-

SHEPPARD MULLIN RICHTER
& HAMPTON LLP,

        Defendant.

_____x

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

        Plaintiff,                              No. 11 civ. 5983 (CM)

       -against-

DLA PIPER (US) LLP,

        Defendant.

_____x

4

DEVELOPMENT SPECIALISTS, INC., in its capacity
as Plan Administrator for Coudert Brothers LLP,

                  Plaintiff,                          No. 11 civ. 5984 (CM)

     -against-

DECHERT LLP,

                  Defendant.

_____x

## DECISION AND ORDER DENYING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND GRANTING PLAINTIFF'S CROSS-MOTION FOR A DECLARATION

McMahon, J.:

## I. INTRODUCTION

Plaintiff Development Specialists Inc. ("DSI"), in its role as administrator of the bankruptcy estate of the dissolved law firm Coudert Brothers LLP ("Coudert") brought this suit against ten law firms – Defendants Akin Gump Strauss Hauer & Feld LLP, Arent Fox LLP, Dorsey & Whitney LLP, Duane Morris LLP, Jones Day, K & L Gates LLP, Morrison & Foerster LLP, Sheppard Mullin Richter & Hampton LLP, DLA Piper (US) LLP, and Dechert LLP (the "Firms" herein) – to recover from the Firms profits that former Coudert partners earned while completing client matters of Coudert that were pending but uncompleted on the date of its dissolution.

Presently before the Court are the Firms' motions for summary judgment dismissing the complaint, and DSI's cross-motion for a declaration that the unfinished client matters were Coudert's property on the day it dissolved. For the reasons discussed below, the Firms' motions are granted in part and denied in part, and DSI's cross-motion is granted.

## II. BACKGROUND

The following facts are undisputed, unless otherwise noted.

A. Facts

Coudert is a law partnership first organized in 1853. (See e.g., DSI's 56.1 (Jones Day) ¶ 1; Jones Day's Resp. 56.1 ¶ 1.) Although it is presently dissolved, it maintains a legal existence, because it is not yet "terminated." See infra.

At all times relevant to this case, Coudert operated under a written partnership agreement, last amended December 30, 2004 (the "Coudert Partnership Agreement"). (See, e.g., DSI's 56.1 (Jones Day) ¶ 2 (citing Keefe Decl. ¶ 7, Ex. A (Coudert Partnership Agreement, or CPA in citations); Jones Day's Resp. 56.1 ¶ 2.) It includes several provisions relevant to these motions, which are addressed further below.

In accordance with the terms of Article 10 of the Coudert Partnership Agreement, Coudert dissolved on August 16, 2005 (the "Dissolution Date"). (DSI's 56.1 (Jones Day) ¶¶ 8-9; Jones Day's Resp. 56.1 ¶¶ 8-9.) On the Dissolution Date, the equity partners adopted a "Special Authorization," which provides, as relevant, the following:

> The Equity Partners . . . hereby authorize the Executive Board . . . to take such actions as it may deem necessary and appropriate, including, without limitation, the granting of waivers, notwithstanding any provisions to the contrary in the Partnership Agreement . . ., in order to:
>
> a.       . . . sell all or substantially all of the assets of . . . the Firm to other firms or service providers, in order to maximize the value of the Firm's assets and business;
>
> b.       wind down the business of the Firm with a view to continuing the provision of legal services to clients and the orderly transition of client matters to other firms or service providers, in order to maximize the value of the Firm's assets and business to the extent possible . . . .

6

(Keefe Decl., Ex. A, at 76.)

Some of Coudert partners who were with the Firm on the Dissolution Date were subsequently hired by the Defendant Firms. (See, e.g., Akin Gump 56.1 ¶ 3; Sheppard Mullin 56.1 ¶ 4; Arent Fox 56.1 ¶ 3; DLA Piper ¶ 3; Morrison & Foerster 56.1 ¶ 3; Dechert 56.1 ¶ 3; Dorsey & Whitney ¶ 3; K&L Gates 56.1 ¶ 4; Duane Morris 56.1 ¶ 3.) They are referred to herein as the "Former Coudert Partners."[1]

On the Dissolution Date, there remained, between Coudert and its clients, partly performed contracts for the provision of legal services. These matters were part of the "business of the Firm" that the Executive Board was authorized to "wind down." When the Former Coudert Partners joined the Firms, the Firms were retained by Coudert's (former) clients to conclude some of the legal matters left unfinished by Coudert on the Dissolution Date. (See, e.g., Sheppard Mullin 56.1 ¶ 5; Arent Fox 56.1 ¶ 4; DLA Piper 56.1 ¶ 4; Morrison & Foerster 56.1 ¶ 4; Dechert 56.1 ¶ 4; Dorsey & Whitney 56.1 ¶ 3; K&L Gates 56.1 ¶ 5; Duane Morris 56.1 ¶ 4; Jones Day 56.1 ¶ 4.) These are referred to herein as the "Client Matters."[2]

The Firms completed the Client Matters. The Firms submitted testimony that they billed all of the Client Matters (with two exceptions) on an hourly basis. (See, e.g., Akin Gump 56.1 ¶ 5; Sheppard Mullin 56.1 ¶¶ 6-7; Arent Fox 56.1 ¶ 5; DLA Piper 56.1 ¶ 5-6; Morrison & Foerster 56.1 ¶ 5; Dechert 56.1 ¶¶ 5-6; Dorsey & Whitney 56.1 ¶¶ 4-5; K&L Gates ¶ 5; Duane Morris

---

[1]     DSI appears to disclaim any "unfinished business" recovery based on the actions of partners who left Coudert prior to the Dissolution Date. (See, e.g., DSI's 56.1 Resp. (Duane Morris) ¶ 3; DSI's 56.1 Resp. (Jones Day) ¶ 8; DSI's Opp. Br. at 19 n.14.)

[2]     Defendant Akin Gump submits an affidavit attesting that it was retained by former Coudert clients only on "new" legal matters, wholly unrelated to the Client Matters, i.e., those on which Coudert was retained before the Dissolution Date. (See Akin Gump 56.1 ¶ 4; cf. Jones Day 56.1 ¶ 8.) If this fact were established, Akin Gump would be entitled to judgment as a matter of law. However, this is a pre-discovery motion for summary judgment on a discrete legal issue and DSI has taken no discovery. It should be allowed to do so before I dismiss the claim against Akin Gump's on this particular ground.

56.1 ¶¶ 5-6; Jones Day 56.1 ¶ 5; but see DLA Piper 56.1 ¶ 7 (acknowledging "incentive fee" matter); Jones Day 56.1 ¶ 7 (acknowledging "flat fee" matter).)  The Court assumes, for purposes of this motion, that this is true.  The complaint does not reveal whether Coudert billed the Client Matters on an hourly basis, though I would be surprised to learn otherwise.

The record does not reveal the extent of any profits gained (or losses sustained) by the Firms while completing the Client Matters.

B.  Prior proceedings

Coudert filed for Chapter 11 bankruptcy in this District in September 2006. See In re Coudert Bros. LLP (Retired Partners), 2011 WL 5593147, at *1 (S.D.N.Y. Sept. 23, 2011).  On August 27, 2008, the Bankruptcy Court entered an order confirming the First Amended Liquidation Plan. (See Adler Decl. Ex. 1.)  That plan became effective on September 8, 2008, and DSI was appointed as Plan Administrator of the Coudert bankruptcy estate.  In that role, DSI is empowered to act on behalf of the Coudert bankruptcy estate.

The procedural path from the interposition of DSI's claims in this matter as adversary proceedings in the Bankruptcy Court to the decision on this motion is convoluted.  For additional background, see this Court's prior orders in these (and related) matters. See Development Specialists, Inc. v. Orrick, Herrington & Sutcliffe, LLP, 2011 WL 6780600 (S.D.N.Y. Dec. 23, 2011); Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP, 462 B.R. 457 (S.D.N.Y. 2011) ("DSI v. Firms" herein).  Insofar as is relevant here, DSI brought thirteen separate adversary proceedings against the Firms, premised on the "unfinished business doctrine;" it argued that the Firms are liable to Coudert for any profits derived from completing the Client Matters that the Former Coudert Partners brought to the Firms.  The complaints lodged

8

claims under New York law and Federal bankruptcy law for an accounting, turnover, unjust enrichment, and conversion. (Huene Decl., Exs. A-M); see generally DSI v. Firms, 462 B.R. at 460-62.

The Firms moved to dismiss the complaints, arguing primarily that the unfinished business doctrine on which DSI relied did not apply to the Client Matters, because they were billed by the hour rather than taken on contingency. An all day hearing was held on the motions on July 31, 2009. On August 7, 2009 the Bankruptcy Court (Drain, J.) denied the motions to dismiss in a bench ruling.

Judge Drain acknowledged that the application of the unfinished business doctrine to non-contingency cases had not been addressed by the New York Court of Appeals. Given a lack of clarity regarding the doctrine generally, Judge Drain observed, "If I had the power, this would be a case for certification to the New York Court of Appeals; however, the New York Constitution precludes that course except for requests by the Second Circuit."

Nevertheless, relying on authority from other jurisdictions – which, like New York, base their partnership law on the Uniform Partnership Act ("UPA") – Judge Drain concluded that New York's highest court, if faced with the issue, would conclude that the unfinished business rule applies both to contingency fee matters and to non-contingency (billable hours) matters. He rejected the Firms' argument that the unfinished business doctrine is essentially a form of quantum meruit. Rather, Judge Drain found that liability for profits realized from unfinished business follows from a partner's continuing duties to her former firm. (See generally Adler Decl. Ex. 5.)

In late 2009 and early 2010, the Firms filed answers to DSI's complaints.

9

An amended bench ruling superseded the original decision in January 2010. After it was entered, the Firms moved for direct certification of the issue to the Second Circuit Court of Appeals under 28 U.S.C. § 158(d)(2), on the basis that New York law on the issues raised was unsettled. Judge Drain denied the motion, and the Honorable Victor Marrero, of this Court, subsequently denied the Firms' motion for leave to appeal Judge's Drain's non-final order denying the motion to dismiss the complaints, concluding that, "Although the application of the unfinished business doctrine to hourly fee matters is a matter of first impression in New York, that alone does not mean that the question is a 'difficult' one." See generally In re Coudert Bros. LLP Law Firm Adversary Proceedings, 447 B.R. 706 (S.D.N.Y. 2011).

In the wake of the United States Supreme Court's decision in Stern v. Marshall, 131 S.Ct. 2594 (2011), the Firms moved to withdraw the reference to the Bankruptcy Court. I granted that motion last September, because Judge Drain will not be able to make a final ruling in this case, and little discovery had been taken. See generally DSI v. Firms, 462 B.R. at 457.

The parties have subsequently filed the cross-motions for summary judgment on the discrete issue of whether the unfinished business rule applies to the Client Matters that are the subject of DSI's complaints.

### III. DISCUSSION

A. Summary judgment standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

10

475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986).

Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998), but must support the existence of an alleged dispute with specific citation to the record materials, Fed. R. Civ. P. 56(c).

While the Court must view the record "in the light most favorable to the non-moving party," Leberman v. John Blair & Co., 880 F.2d 1555, 1559 (2d Cir. 1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," Heyman v. Commerce and Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec., 475 U.S. at 586 (citations omitted).

Finally, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

B. Syllabus

The cross-motions raise two separate issues

Issue 1: Were the pending but incomplete Client Matters among Coudert's "assets" on the Dissolution Date? If they were, then the Former Coudert Partners have a duty to account to Coudert for any post-dissolution profits attributable to the use of those assets. The Firms move for summary judgment, arguing that Coudert had no property interest in the Client Matters on and after the Dissolution Date, because the clients were billed by the hour and the payment to firm was not subject to any contingency. DSI cross-moves for a declaration that the Client Matters were Coudert assets because they were "unfinished business" of the firm on the Dissolution Date.

Answer: Although the New York Court of Appeals has not addressed this precise issue, I believe that it would conclude that the method by which the Client Matters were billed does not alter the nature of Coudert's property interest in them. Under the Partnership Law, the Client Matters are presumed to be Coudert's assets on the Dissolution Date. While the Coudert Partnership Agreement could have provided otherwise, it does not; on the contrary, it confirms the statutory presumption, as does the text of the Special Authorization adopted by the partners who voted to dissolve the firm. In the absence of any evidence that Coudert's partners intended to exclude pending but uncompleted client representations from the firm's assets, DSI is entitled to a declaration that the Client Matters were Coudert assets on the Dissolution Date. Because they are Coudert assets, the Former Coudert Partners are obligated to account for any profits they earned while winding the Client Matters up at the Firms.

Issue 2: Assuming the Client Matters were Coudert assets on the Dissolution Date, are the Firms nevertheless entitled to summary judgment because the Client Matters had no value as

12

a matter of law?  The Firms' fall-back argument for summary judgment is that Coudert's interest in the Client Matters is limited to the value of its pre-dissolution services.  These actions should be dismissed, they contend, because, as a matter of law, the value of the post-dissolution "efforts, skill and diligence" of the Former Coudert Partners equals the fees paid for legal services performed at the new Firms.  Thus, the extent of the Former Partners' duty to account for their post-dissolution effort in finishing the matters is zero, and the Estate's only interest lies in collecting receivables for work on the Client Matters performed at Coudert prior to dissolution.

Answer: It cannot be said as a matter of law or of undisputed fact that the Client Matters did not generate any profit that will have to be remitted to Coudert's bankruptcy estate.  The issue needs to be tried.

Result: DSI's cross-motion is granted and the Firms' motions are denied.  However, the Firms are entitled to summary judgment dismissing DSI's claims for turnover, unjust enrichment and conversion.  The rights and duties of the parties will be finally settled in an accounting – the traditional remedy for resolving monetary disputes among former partners.

## IV.  GENERAL PRINCIPLES OF NEW YORK PARTNERSHIP LAW

The law of partnerships in New York is codified in the New York Partnership Law, itself a codification the Uniform Partnership Act ("UPA"), see McKinney's New York Partnership Law ("Partnership Law") § 1 (1919), and reflected in judicial decisions before and after its enactment.

"The Partnership Law's provisions are, for the most part, default requirements that come into play in the absence of an agreement." Ederer v Gursky, 9 N.Y.3d 514, 526 (2007). Significantly for our case, the Coudert Partnership Agreement expressly incorporates the Partnership Law's default rules. (CPA Art. 10(a).)

13

"A partnership is an association of two or more persons to carry on as co-owners a business for profit . . ." Partnership Law § 10(1). Joint ownership of the business and sharing and the profits and losses of the business are the key indicia of a partnership. Id. § 11. Jointly owned "partnership property" includes "All property originally brought into the partnership stock or subsequently acquired, by purchase or otherwise," and, "Unless the contrary intention appears, property acquired with partnership funds." Id. § 12. Partners are presumed to devote all of their efforts to the partnership business, and are entitled to no compensation for doing so beyond their proportional interest in the profits the business generates. Id. § 40(6). Partners owe one another, and the partnership, fiduciary duties, including the duty to account for any benefit a partner derives from his use of partnership property. Id. § 43.

Under the Partnership Law, a partnership can dissolve for several different reasons. Among them is an agreement by the partners to dissolve, the death of a partner, or the decision of a partner to withdraw. See Partnership Law § 62; see also Vollgraff v Block, 117 Misc. 2d 489, 492 (Sup. Ct. Suffolk County 1982) (citing Matter of Silverberg (Schwartz), 81 A.D.2d 640 (2d Dep't 1981)).

However, "Dissolution is not termination." Scholastic, Inc. v. Harris, 259 F.3d 73, 85 (2d Cir. 2001) (citing Partnership Law §§ 60, 61). Instead the partnership "continues" in existence until the "winding up" of its affairs is completed. This case concerns the duties of the partners to each other while the firm is in this liminal state.

Post-dissolution, former partners generally do not owe fiduciary duties either to one another or to the dissolved firm. But there is an important exception: they have a continuing duty to each other as they wind up the partnership's affairs, including winding up the partnership's unfinished business. See, e.g., Ajettix Inc. v Raub, 9 Misc. 3d 908, 912 (Sup. Ct.

14

Monroe County 2005) ("[O]n dissolution, partners owe a continuing fiduciary duty to one
another with respect to dealings effecting the winding up of the partnership *and the preservation
of the partnership assets*.") (emphasis added); see also King v Leighton, 100 N.Y. 386 (1885).

This duty devolves on *all* partners at the moment of dissolution, whether they remain
behind to wind up the firm's business (as Coudert's Executive Board did), or leave their former
firm and wind up the business elsewhere. Compare Stem v Warren, 227 N.Y. 538 (1920) (post-
dissolution liability of winding up partner), with Rhein v Peeso, 194 A.D. 274 (1st Dep't 1920)
(post-dissolution liability of departing partner); see also Shandell v Katz, 217 A.D.2d 472 (1st
Dep't 1995) (departing law partner); Murov v Ades, 12 A.D.3d 654 (2d Dep't 2004) (same). In
either case, if a former partner makes use of a "partnership asset," or "partnership property," she
has a fiduciary duty to account to her former partners for any benefit that she derives from it.
That includes the business of the partnership. As the Supreme Court put it in Denver v. Roane,
99 U.S. 355, 358 (1878):

> Having jointly undertaken the business intrusted to the partnership, *all the parties*
> were under obligation to conduct it *to the end*. This duty they owed to the clients
> and to each other. *And as to the unfinished business remaining with the firm on
> [the date of dissolution], the duty continued.* (emphases added).

This duty is codified in section 43 Partnership Law, which says that, "Every partner must
account to the partnership for any benefit, and hold as trustee for it any profits derived by him
without the consent of the other partners from any transaction connected with the formation,
conduct, or liquidation of the partnership or from any use by him of its property." Partnership
Law § 43(1).

Partnership Law § 73 is part of the Article of the Partnership Law that deals with
dissolution. It provides that, if the winding up partners do not immediately settle accounts with a
partner who dies or withdraws from the partnership upon dissolution, they have a duty to account

15

for the departing partner's percentage interest in the partnership property as of the date of dissolution. Moreover, the departing partner, or his estate, is entitled either to interest on the amount of his share of the partnership property, running from the date of dissolution, or, "in lieu of interest, the profits attributable to the use [by the winding up partner] of [the departing partner's] right in the property of the dissolved partnership. . . ." Id. § 73; see also Kirsch, 181 A.D.2d at 225.

The Appellate Division First Department has said that Partnership Law § 73 is determinative of the "departing" partner's duty to his dissolved firm. See Shandell, 217 A.D.2d at 473. However, that is not really correct. "It is to be observed that [New York at Partnership Law § 73] is substantially an enactment of the common law rule governing *the rights of retiring partners or representatives of deceased partners* where the business is continued after the retirement or death of a partner." 2 A.L.R.2d 1084, *Construction and application of § 42 of Uniform Partnership Act as to rights of parties where business is continued after a partner retires or dies*, § 1 (emphasis added).[3] Thus, the Second Circuit has recognized that, "Section 73 is *not* the source of the duty of a lawyer to account to his former partners." (Emphasis added). Rather, "The source of the duty is the fiduciary relationship of trust and confidence that partners have from time immemorial shared with one another." Santalucia, 232 F.3d at 300. That duty is the same whether it runs from the winding up partners to the departing partner, or the departing partner to the winding up partner. Partnership Law § 73 remains relevant only as a means to measure of what is owed to a former partner on dissolution, and even then can be trumped by a partnership agreement – as it is in the case of Coudert. See infra.

So the oft-stated rule that, "After dissolution, each former partner is free to practice law individually, and has the right to accept retainers from persons who had been clients of the firm,"

---

[3]       Partnership Law § 73 is New York's enactment of § 42 of the UPA.

Silverberg, A.D.2d at 641 (citing Talley v. Lamb, 100 N.Y.S.2d 112 (Sup. Ct. New York County 1950)) must be qualified to recognize a former partner's duty to account for his use of partnership property after dissolution. This qualification is so implicit in the nature of a partnership that it should go without saying. A departing partner is not free to walk out of his firm's office carrying a Jackson Pollack painting he ripped off the wall of the reception area, simply because the firm has dissolved. Partnership property remains partnership property, dissolution notwithstanding, and a former partner of the dissolved firm must account for any benefit he derives from his use of a partnership asset, even if he is not among the "winding up partners" charged with winding up the firm's affairs.

The duty to account under the unfinished business doctrine is *not* based on principles of quantum meruit – the dissolved firm's equitable claim for compensation for the value of work actually performed prior to dissolution. With the exception of Aurnou v. Greenspan (161 A.D.2d 438 (1st Dep't 1990)) – which was subsequently repudiated by the very court that decided it – the New York courts have uniformly rejected quantum meruit as the analytical basis for the duty to account for profits yielded by business unfinished when a law firm dissolves. Kirsch, 181 A.D. at 225-26 (rejecting Aurnou); Dwyer v Nicholson, 193 A.D.2d 70, 73 (2d Dep't 1993) (same); Shandell, 217 A.D.2d at 473 (same); see also DelCasino v Koeppel, 207 A.D.2d 374 (2d Dep't 1994); Grant v Heit, 263 A.D.2d 388 (1st Dep't 1999). The Second Circuit, whose decisions bind this Court, also rejected the quantum meruit argument; in Santalucia, the court reversed a District Court's reliance on a quantum meruit measure in a case involving a departed attorney's duty to account to his former firm. Santalucia, 232 F.3d at 297-98.

Moreover, the quantum meruit rationale has been almost universally rejected in other UPA jurisdictions. See, e.g., Jewel v. Boxer, 156 Cal.App.3d 171, 177 (Cal. Ct. App. 1984)

17

(collecting cases); Sufrin v. Hosier, 896 F. Supp. 766, 769-70 (N.D. Ill. 1995) (applying Illinois law, rejecting quantum meruit rationale). Partnership Law § 4(4) instructs New York courts to adopt interpretations of its provisions that conform to other UPA states, so were there no New York precedent addressing the question, the presumption of uniformity with other state's interpretations would point to the same result.

The question that naturally arises is whether the partner is entitled to deduct from the net profits "reasonable compensation" for her post-dissolution efforts before remitting the balance to her former partners for division. The answer at common law was simple: no. See, e.g., King, 100 N.Y. at 393-95. The Supreme Court gave the common law rule as follows: "[W]here partnerships are equal, as was true in the present case, and there is no stipulation in the partnership agreement for compensation to a surviving partner for settling up the partnership business, he is entitled to no compensation." Denver v. Roane, 99 U.S. 355, 358 (1878). The same is true under the statutory scheme. New York's Partnership Law codifies the "no compensation rule" in § 40(6): "No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs." The Legislature elected to modify the no compensation rule only where dissolution of the partnership was caused by death, which is the only time there can be a "surviving" partner; a partner who winds up business on dissolution for any reason other than death is not a surviving partner, so the modification is not applicable here. See, e.g., Geist v. Burnstine, 19 N.Y.S.2d 76, 77 (1st Dep't 1940); see also Beckman, 579 A.2d at 640 (collecting cases).

Notwithstanding the text of the Partnership Law, New York courts have found a way to avoid the harshest application of the no compensation rule – at least in the limited context of

18

"unfinished business" claims arising out of contingent fee legal representations. They have done so, not by rejecting the rule outright, but by reducing the profits for which a former partner must account by an amount that reflects the value of his post-dissolution "efforts, skill, and diligence" in concluding the matter. See, e.g., Kirsch, 181 A.D.2d at 226; Murov, 12 A.D.3d at 656. The Second Circuit has adopted this approach. Santalucia, 232 F.3d at 298. The New York Court of Appeals has never considered whether what I will call the "Kirsch rule" is runs afoul of the "no compensation" rule codified in Partnership Law § 40(6).

Finally, the Partnership Law does not distinguish between law partnerships and other kinds of partnerships. To the contrary, its provisions are applicable generally to partnerships engaged in any business or profession. Partnership Law § 2 ("'Business' includes *every* trade, occupation, or profession.") (emphasis added).

The provisions of the Partnership Law just discussed may appear dated, or even downright quaint, to observers of the kind of sophisticated corporate law practice that was carried on at Coudert. In the context of the "mega-firm" model – divisions among classes of partners, client hoarding, and mercenary lateral hiring – one could argue that the law's presumption that partners are mutual owners of all of a law firm's business, and that all contribute to its success and so are entitled to share in the profits, no longer reflects the reality of practice.[4] Many partners at such firms no longer view their "book of business" as an asset of the firm, but as a jealously guarded piece of personal property. See, e.g., Mark Harris, *Why More Firms Will Go the Way of Dewey & LeBoeuf*, Forbes (May 8, 2012) ("The portability of the partner's 'book' has weakened the bonds that hold firms together and threatens the identity of the

---

[4]     See, e.g., Paul M. Barrett, Law Firms' White Shoes Blues, Businessweek (April 18, 2012) ("In a business increasingly characterized by fierce bidding for talent and high-level defections, many successful attorneys jealously hoard clients and keep an eye on the American Lawyer numbers to see whether they ought to take their 'book of business' elsewhere. Under these circumstances, client loyalty at many firms has deteriorated.") (available at www.businessweek.com/printer/articles/21004-law-firms-white-shoe-blues).

law firm as we know it.") (available at

http://www.forbes.com/sites/forbesleadershipforum/2012/05/08/why-more-law-firms-will-go-the-way-of-dewey-leboeuf/). Such a view undermines the conclusion that such client matters really are property of the firm, as well as the premises of the no compensation rule. But the Partnership Law says otherwise.

Furthermore, the statute only sets default rules. With few exceptions (one of which will be explored below), partners are free to vary these rules by partnership agreement. The mega-firm is not the only model for a law partnership (or any partnership), so the law's assumptions about the nature of partnership, as codified in the statute and reflected in the numerous decisions interpreting it, should not be set aside in the absence of an explicit agreement among partners that they wish to operate under different rules. If law firms like Coudert need an alternative set of assumptions to survive in a new marketplace, they are free to provide for one in their partnership agreements. Given their resources and sophistication, it is far more equitable to ask them to draft any special rules they want to follow than it is to add a gloss to the statute applicable to the far more numerous, and undoubtedly less sophisticated, partnerships the affairs of which are governed by the Partnership Law. In the absence of special rules, the Couderts of this world are bound by the "quaint" practices of yore.

With these principles in mind, I turn to the issues presented by the cross-motions.

## V.  ANALYSIS OF THE ISSUES

### A.  The Client Matters Were Coudert Assets on the Dissolution Date

> 1. *The New York Court of Appeals would not distinguish among unfinished business according to how it is billed*

I conclude that the New York Court of Appeals would, if confronted with the issue, conclude that all client matters pending on the date of dissolution are assets of the firm – regardless of how the firm was to be compensated for the work.

### a.  Nature of a partnership and partnership property

Every partnership is an association of people to conduct business as co-owners in the hope of making a profit.  It is a general principle of partnership law that partners are expected to devote their efforts to the partnership business, not to individual endeavors.  Thus, the presumption *must* be that the firm's business belongs to the firm, and not to any individual partner.

The alternative would be that, even while the firm was in active operation, client matters – i.e., the firm's business – would presumptively be, *not* firm property, but the personal property of individual partners (most likely, whatever partner originated the client representation).  This alternative leads to results that are contrary to the most basic provisions of the Partnership Law.  Indeed, such an arrangement would not fit within the definition of a "partnership at all," because the business would not be carried on by "co-owners."  See Partnership Law § 10 ("A partnership is an association of two or more persons to carry on *as co-owners* a business for profit.") (emphasis added).

Of course, many law firms do make efforts to reward business origination by allocating different profit shares to different partners (as Coudert did), by awarding payment in the nature of "bonuses" to unusually productive partners, or even (as we read in the news) by guaranteeing

particular partners a certain quantum of compensation.  But this result is not achieved by making individual partners the owners of client matters they originate, with no duty to account to anybody but themselves.  Assuming that such an ownership structure could be bargained for, it would not be a "partnership" as the law envisions a partnership; and, as detailed below, the Coudert partners did not bargain for such an arrangement.

All executory contracts for the provision of client services by a partnership are presumed to belong to the partnership, rather than individual partners. "A law partnership not only possesses fixed assets in the form of typewriters, bookcases, etc., *it possesses assets in the form of cases and legal matters*." Matter of Lester (Berman), 61 A.D.2d 935, 936 (1st Dep't 1978) (emphasis added).  For that reason alone, their status as assets should not depend on how the client pays the firm.  The payment on the contract could be upfront, on completion, intermittent, or any combination thereof.

> b.  **As a general rule, the unfinished business of a professional partnership is an asset of the partnership unless a contrary intention appears.**

The general rule is that the business of a partnership that is unfinished on the date the partnership dissolves is an asset of the partnership, and must be concluded for the benefit of the dissolved partnership. Stem v Warren, 227 N.Y. 538 (1920).  This rule is often referred to as the "unfinished business doctrine."

"Unfinished business" must be distinguished from "finished business" – business that has been completed prior to dissolution (the merger done and documented; the lawsuit tried to verdict or settled).  If a firm has finished a piece of business but has not collected its fee, in whole or in part, the resulting receivable is, obviously, an asset of the firm.  If the firm liquidates, the fee has to be collected for the benefit of the members of the firm in liquidation. Jackson v. Hunt, Hill & Betts, 7 N.Y.2d 180, 183 (1959).

22

"New business" is an entirely new contract or engagement to do a piece of work. New business that is contracted for and undertaken only after a partnership dissolves – even business from a client of the dissolved firm – is not an asset of the dissolved firm, because a partnership has no more than an expectation of obtaining future business from a client. For that reason, the attorney who conducts the business and collects the resulting fee owes no duty to his former partners to account for any profit he may earn. Stem, 227 N.Y. at 550; see also Conolly v Thuillez, 26 A.D.3d 720, 723 (3d Dep't 2006); In re Brobeck, Phleger & Harrison LLP, 408 B.R. 318, 333 (Bnkr. N.D. Cal. 2009) (applying California law). Retainers from former clients on new matters – even matters, like appeals, that are related to finished representations – have been treated as "new" business and are not subject to the duty to account. See, e.g., Talley, 100 N.Y.S.2d at 117-18 (no duty to account for fees earned on appeals from matters originally handled as partnership business).[5]

Between "finished business" and "new business" lies unfinished business: executory contracts to perform services, begun but not fully performed by the partnership on the date of its dissolution. Unfinished business is presumptively treated as a partnership asset subject to distribution.

The fact that a contract is executory does not mean that it cannot be considered an asset of a professional partnership. Even an executory contract that is terminable at will by the client (which is true of all contracts to provide legal representation, as a matter of public policy) can be a partnership asset, notwithstanding the uncertainty that it will ever be fully performed. See King, 100 N.Y. at 393 ("[T]he executors of a deceased partner were entitled to the profits made

---

[5]     This rule explains why, as alluded to in a previous footnote, Defendant Akin Gump would be entitled to summary judgment if there were no dispute of genuine fact that it only represented former Coudert clients on "new" matters, unrelated to matters pending but uncompleted by Coudert on the Dissolution Date. As noted, DSI wil have an opportunity, through discovery, to explore whether Akin Gump's factual assertion is correct.

upon contracts pending, unperformed at the death of their testator, and thereafter completed.");
see also Stem, 227 N.Y. at 544 (executory contract for architectural services, terminable at will,
was partnership asset); see also Santalucia, 232 F.3d at 297-99 (unfinished legal representations
can be valuable partnership asset).

However, the fact that an executory contract, terminable at will, *can* be a partnership
asset does not mean that every executory contract necessarily *must* be such an asset. If the
parties indicate a contrary intent, that will control. See Dawson v White & Case, 88 N.Y.2d 666,
671 (1996) ("[T]he partners are free to exclude particular items from the class of distributable
partnership property, and such an agreement will be enforced in an accounting proceeding."); see
also Stem, 227 N.Y. at 546-47.

The New York Court of Appeals has squarely held, in the context of professional services
partnerships other than law firms, that executory contracts to perform professional services are
partnership assets unless a contrary intention appears. That was the rule applied in Stem v.
Warren, 227 N.Y. 538 (1920). There, two architecture firms – Reed and Stem ("RS") and
Warren and Wetmore ("WW") – became partners for the purpose of planning and overseeing
construction of Grand Central Station. The resulting partnership ("RS & WW") entered a
contract with the New York Central and Hudson River Railroad Company (the "Railroad") to do
that work. Id. at 543-44. The contract was terminable at will by the Railroad – albeit with
provision for payment for work completed. Id. at 544.

RS & WW performed work under the contract for some years, until November 12, 1911,
when Reed (of RS) died, thereby dissolving the partnership. Following his death, Wetmore (of
WW) contacted the Railroad and asked it to retain WW to finish the work on the Station. The
Railroad agreed. It entered a contract with WW, effective December 19, 1911, and terminated

24

the contract with RS & WW effective December 31, 1911. The Railroad paid RS & WW for all services rendered through the date of termination, so the partnership had recovered the full value of its pre-dissolution services, and had no outstanding accounts receivable from the Railroad at that point. Id. at 545. WW subsequently completed work on the Station and was paid under the terms of its contract with the Railroad.

Even though RS & WW had been paid in full for the value of services provided prior to dissolution, Reed's estate sued WW for an accounting of all profits WW earned on the contract after RS & WW dissolved. The Estate prevailed. The New York Court of Appeals held that, when Reed died, RS & WW dissolved, and all the surviving partners were immediately vested with ownership of RS & WW's property for the purpose of winding up the partnership's affairs. The Railroad contract was considered to be the partnership's asset on dissolution – "The most valuable asset of such partnership was the contract between it and the railroad company," Stem, 227 N.Y. at 546-47 – and WW was required to account for all profits it earned for completing the business after dissolution. The Court held:

> Upon the death of Mr. Reed it was the duty of the survivors of the firms to take possession of the firm's assets, perform the contract, extinguish the firm's liabilities, and close its business for the interest of all parties concerned, and the representatives of Reed were entitled to share in the profits of all unfinished business though subsequently completed.

Id. at 547.

The fact that the Railroad could have terminated the contract at will did not compel the conclusion that the contract was not "property" of the partnership. Similarly, the fact that RS & WW had been fully compensated for its pre-dissolution efforts, and that no accounts receivable from the Railroad were outstanding on the dissolution date, did not mitigate WW's obligation to account for all post-dissolution profits earned from finishing the work on the Grand Central

25

Terminal.  The contract for services was an asset of the partnership, and because it was an asset of the partnership, the benefits it yielded to former partners after dissolution belonged to the dissolved partnership.  See also Rhein, 194 A.D. at 274 (executory contract, payment due on completion, was an asset of a dental partnership on the date of dissolution); Kirsch, 217 A.D.2d at 472 (executory contract, payment contingent on success, is an asset of a law partnership on the date of dissolution, unless partners agree otherwise).

Other federal courts in this Circuit have looked to the parties intent to determine whether an executory contract should be treated as partnership property – although Judge Cogan on the Eastern District explained:

> There is surprisingly little New York authority on how a court is to determine what property is within or without a partnership.  Perhaps that is because whether one looks to the Uniform Partnership Act . . . or the common law, the question of whether a particular asset is partnership property is resolved by the fundamental contractual interpretation exercise of determining the parties' intent.  As one treatise has summarized the law:
>
>> The question whether or not personal property owned or acquired by a partner has been contributed by him or her to the firm so as to become partnership property depends on the intention of the parties as revealed by their conduct; by the provisions of the partnership agreement or agreement preliminary thereto; by the terms of written instruments relative to the transfer of the property to or for use of the firm; by entries in the firm books; and by the use of the property in the firm business, although the mere fact that property is used in the firm business will not of itself show that it is firm property.

Sriraman v. Patel, 761 F.Supp.2d 7, 18 (E.D.N.Y. 2011) (citing The John E. Enright, 40 F.2d 588, 590 (2d Cir. 1930); In re Amy, 21 F.2d 301, 303 (2d Cir. 1927); Altman v. Altman, 271 A.D. 884 (2d Dep't 1946); 68 C.J.S. Partnership § 107 (2010)) (other citations omitted).  None of these cases distinguishes between executory contracts to provide services where the partners bill by the hour and executory contracts where partnership compensation is contingent on results: the same intent-based rule applies to all kinds of business.

26

So unless the Firms can suggest a meaningful distinction between law partnerships and other partnerships, or a meaningful difference between legal business that is billed by the hour versus handled on contingency, I can predict with reasonable certainty that the New York Court of Appeals would find that the Client Matters in this case were Coudert's property in the absence of an agreement to the contrary.

### c. **The rule that makes business unfinished at dissolution an asset of the partnership has been applied, in New York and elsewhere, to law firms that handled cases on contingency**

The three New York Appellate Divisions that have addressed this issue, as well as the United States Court of Appeals for the Second Circuit (whose decisions on state law bind me), have applied the general rule that executory contracts are partnership assets in the absence of an agreement to the contrary to law partnerships – but always in the context of cases involving contingency fee cases.

In Kirsch v Leventhal, 181 A.D.2d 222 (3d Dept 1992), the Appellate Division, Third Department discussed the rule in the context of a law firm that dissolved in the middle of a contingency fee case. The court recognized that whether the law partners intended that the matter be classified as a partnership asset was an issue of fact. If the evidence revealed that the partners so intended, however, "the case would have constituted unfinished business of the firm to be evaluated as of the date of dissolution in determining the value of plaintiff's partnership interest." Id. at 224; see also Shandell v Katz, 217 A.D.2d 472 (1st Dept 1993); DelCasino v Koeppel, 207 A.D.2d 374 (2d Dept 1994); Santalucia, 232 F.3d at 294.

Courts in other UPA jurisdictions have also concluded that unfinished legal representations where payment to the lawyers is contingent on recovery by the client are "unfinished business" assets of the retained law partnership upon dissolution, completion of

27

which by any former partner gives rise to a duty to account, as long the partners intended that

result. Jewel v. Boxer, 156 Cal.App.3d 171, 174 (Cal. App. 1st Dist 1984), an intermediate

appellate case from California, is often cited as the leading case for this proposition under the

UPA:

> [I]n the absence of a partnership agreement, the Uniform Partnership Act requires
> that attorneys' fees received on cases in progress upon dissolution of a law
> partnership are to be shared by the former partners according to their right to fees
> in the former partnership, regardless of which former partner provides legal
> services in the case after the dissolution.

Id.; see also Sullivan, Bodney & Hammond v. Bodney, 16 Kan. App.2d 208, 210-11 (Kan. App.

1991) (collecting cases); Beckman v. Farmer, 579 A.2d 618, 636 (D.C. App. 1990) (collecting

cases); LaFond v. Sweeney, --- P.3d ----, 2012 WL 503655, at *1 (Colo. App. Feb. 16, 2012).

The same rule was applied by the United States Supreme Court in at least one pre-Erie case,

Denver v. Roane, 99 U.S. 355, 358 (1858), which cited Caldwell v. Leiber, 7 Paige Ch. 483

(N.Y. 1839), a New York case, as authority. See also Consaul v. Cummings, 222 U.S. 262

(1911).

If the partners do not specify whether a particular representation is intended to be an asset

of the partnership subject to distribution on dissolution, courts treat their silence as signifying an

intention that it should: "In the absence of an agreement to the contrary, pending contingency fee

cases of a dissolved partnership are assets subject to distribution." Murov, 12 A.D. 3d at 655; see

also Conolly, 26 A.D.3d at 720 (same); Liddle, 304 A.D.2d at 441 (same); Gottlieb, 298 A.D.2d

at 300 (same); Grant, 263 A.D.2d at 388 (same); McDonald, 233 A.D.2d at 22 (same); Shandell,

217 A.D.2d at 472; DelCasino, 207 A.D.2d at 374 (same); Dwyer, 193 A.D.2d at 70 (same);

Kirsch, 181 A.D.2d at 222 (same).  The Second Circuit has embraced this rule where the client

matter was handled on contingency. Santalucia, 232 F.3d at 295.

### d. **Courts in other UPA jurisdictions have applied the same rule where law firms handle cases on a non-contingency basis.**

Every court in a UPA jurisdiction that has considered the precise question posed here has

concluded that billable hours matters are partnership assets in the absence of any expressed

intention that they should be treated otherwise.

> On the basis of the[] principles [of the UPA], every other court confronted with this issue of division of post-dissolution proceeds of a law partnership has held that pending cases, regardless of whether they are hourly-fee cases or contingent-fee matters, are unfinished business requiring winding up after dissolution, and are therefore assets of the partnership subject to post-dissolution distribution.

In re Labrum & Doak, LLP, 227 B.R. 391, 408 (Bnkr. E.D. Pa. 1998) (citing cases from

California, Pennsylvania and the District of Columbia). The fact that New York courts must

harmonize their rulings with those of other UPA jurisdictions by statute, Partnership Law § 4(4),

is powerful reason to conclude that the New York Court of Appeals would reach the same result.

For example, in Rothman v. Dolin, an intermediate appellate court in California applied

the Jewel rule to cases billed by the hour. 20 Cal. App. 4th 755 (Cal. Ct. App. 1993). Noting that

Jewel never explicitly limited the application of the unfinished business doctrine to contingency

fee matters, the court ruled:

> the policy reasons for the rule announced in Jewel . . . apply with equal force to both contingency and hourly rate cases. Indeed, according different treatment to hourly rate and contingency fee cases would lead to the prospect of attorneys shunning contingency fee cases in anticipation of a possible dissolution of the law firm, and scrambling to get the hourly rate cases rather than the contingency fee cases upon dissolution.

Id. at 758; id. at 759 ("That one matter is to be compensated at an hourly rate and another on a

contingency basis is of no consequence in determining whether a matter is unfinished

business."); see also In re Brobeck, 408 B.R. at 333 (applying Pennsylvania law).

The District Court for the District of Columbia reached the same result in Robinson v. Nussbaum, 11 F. Supp. 2d 1 (D.D.C. 1997). The District of Columbia Court of Appeals had previously ruled, in the context of contingency fee cases, that unfinished client representations are partnership assets, use of which by one former partner renders her liable to account to her former partners. Beckman v. Farmer. 579 A.2d 618, 636 (D.C. 1991). In Robinson, the court found no reason to distinguish between hourly billed and contingent fee cases for the purposes of this doctrine:

> The crux of the Beckman opinion fully supports this conclusion. There the Court of Appeals explained that its holding stemmed from two fundamental principles of partnership law. First, dissolution of a law partnership does not terminate existing contracts with its clients. And second, former partners who honor these existing contracts do so as fiduciaries for the benefit of the former partnership. From these principles, the court concluded that work performed after dissolution to resolve pending cases is conducted for the benefit of the dissolved law partnership. The nature of the underlying contractual relationship between the dissolved partnership and its client does not alter the legal status of a dissolved partnership nor does it change the fiduciary duties each partner must honor towards another. They remain the same regardless of how an attorney agrees to be compensated by his clients.

Robinson, 11 F. Supp. 2d at 6.

### e. **The Firms' proposed distinctions do not lead to a contrary result**

Despite the considerations discussed above, the Firms argue that the New York Court of Appeals would distinguish between legal business billed by the hour and legal business paid on contingency, and would conclude that the former were not subject to the unfinished business rule. I find their arguments unpersuasive.

#### i. *No future expectancy (quantum meruit)*

The Firms first argue that there are real differences between contingency fee cases and matters that are billed by the hour, and assert that those differences make the treatment of former upon dissolution of a partnership inapplicable to the latter. They argue that the dissolved

30

partnership's interest in a pending billable hours matter is (or ought to be) limited to the extent of the firm's receivables (billed or yet to be billed) for services rendered prior to dissolution.

I cannot quarrel with the proposition that contingency and billable hour matters are different in critical respects. When a firm takes a case on contingency, it in effect wagers that the cost of completing the matter (lawyer effort and overhead) will be reimbursed and more upon completion. Were a law firm that was retained on contingency to dissolve in the middle of the representation, the dissolved firm would have expended something (perhaps much) in pursuit of the client's goals, and received nothing in return. By contrast, when a case is billed by the hour, the firm is compensated on a periodic basis for work already performed; the only risk the firm runs is the risk that the client will ignore its contractual obligation to pay bills upon receipt. There is no risk that the firm will not be compensated for its time, effort and overhead based on the result of the case. So (assuming the client is not a deadbeat), if the firm dissolves while the matter remains pending, it either has been paid or can obtain payment for all work theretofore performed.

The Firms argue that this difference makes it inappropriate to treat billable hours cases as assets of a law firm that handled work on this basis. In effect, they assert that an engagement to represent a client in a matter – to defend a corporation in a shareholder suit, say, or to prepare documents and provide tax advice in connection with some corporate transaction – does not give rise to a single contract, but rather a series of "mini-contracts," each one corresponding to a new billing period. "Unfinished business," they argue, effectively becomes "finished business" with the submission of each periodic invoice. To put their argument in practical terms, if it were the practice of a law firm to bill its clients on the first day of every month, then when the firm dissolved on May 15 (1) all work done prior to the issuance of the May 1 invoice would be

31

"finished business;" (2) work performed in May but not yet billed would be "unfinished business" (and so subject to the unfinished business rule); while (3) work performed elsewhere by former members of the dissolved firm, during what would have been subsequent billings periods (June, July, August), would be "new business," and so would not subject the former partners to any duty to account.

But the Firms' argument conflates a law firm's rights against its clients – which may differ according to how the matters is billed – and the rights of former partners among themselves, including the right to demand an accounting from any partner who derives a benefit from exploiting a partnership asset. As the cases that reject the quantum meruit rationale for the duty to account make clear (see page 17, supra), these rights are entirely distinct.

The unfinished business doctrine does not exist to assure that a law firm is paid for the value of work it has performed prior to dissolution. It exists to settle accounts among partners upon dissolution of their business. The fact that the client agreed to make payments for services rendered by giving his lawyer a percentage of any winnings realized as opposed to paying him by the hour does not alter the fundamental proposition, codified in Partnership Law § 43, that every partner must account to her former partners for profits realized from the use of what was, on the date of dissolution, a partnership asset.

Furthermore, while law firms have a variety of ways to collect from clients when they dissolve before being paid (or fully paid) for matters handled prior to dissolution, those remedies exist separate and apart from the fiduciary responsibility of the former partners *inter se*, and the measure of recovery they offer attorneys is not the same as the measure of the former partners' duty to each other in dissolution. For example: if a matter was handled on contingency, the law allows the firm to recover for the value of services already rendered in any of three ways, one

which is bringing a plenary action in quantum meruit. Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York, 302 A.D.2d 183, 186 (1st Dept 2002).[6] But the fact that the firm can sue its client in quantum meruit does not limit the rights of its former partners as among themselves to the quantum meruit value of their former firm's services; as should by now be apparent, as among the former partners the duty to account runs to all profits earned by whatever partner finishes the business that the dissolved firm started. Profit is generally greater than the value of services rendered (quantum meruit). Similarly, if the matter was billed by the hour, the law gives the firm a right to sue for payment under the doctrine of account stated. See, e.g., Lapidus & Associates, LLP v. Elizabeth Street, Inc., 92 A.D.3d 405, 405-06 (1st Dept 2012). But an account stated includes payment for overhead as well as profit, and the Partnership Law provides that, as among former partners, the duty to account is limited profits. Were this Court to embrace what is, in effect, a rule that measures a former partner's duty to account under Partnership Law § 43 to the value of the account stated in billable hours cases, it would seriously undermine the reasoning that undergirds cases like Kirsch and Santalucia in the contingency fee context.

The Firms' argument would also run afoul of the New York Court of Appeals' ruling in Stem, the facts of which were discussed at length above. There, the dissolved professional partnership was fully compensated for all work done prior to its dissolution; no accounts receivable were outstanding. Nevertheless, the surviving partners were accountable to the dissolved firm (and to the estate of the partner whose demise effected the dissolution) for the profit they realized on the job that the dissolved partnership had originally contracted to perform. If the Firms had suggested a principled reason why law firms should be treated differently than architectural firms, I would evaluate it, but they do not; and off the top of my head I can think of

---

[6]     The other two are the retaining lien and the charging lien. See Judiciary Law § 475.

none. The Partnership Law certainly does not treat law partnerships any differently than other partnerships. The only idea that suggests itself is that contracts for legal representation must always be terminable at will, so lawyers are not entitled to expectancy damages if a client decides to change lawyers in the middle of a representation. I know of no reason why contracts for architectural services must be terminable at will, but in Stem the contract with the Railroad *was* terminable at will. So terminability and the unavailability of expectancy damages do not seem to be differences that makes a difference.

In any event, the factual premise that undergirds the novel mini-contracts theory is a false one. When a client retains a law firm to represent it in a particular matter, it is not entering into a contract analogous to a month to month lease for its services, but into a contract to provide services, either generally (the classic arrangement of placing a firm "on retainer," which has all but disappeared) or in connection with a particular identified matter or matters. The fact that bills are rendered and payment is obtained periodically, rather than when the matter is entirely concluded, simply reflects the arrangement the parties made about when and how compensation would be received – which is one (and only one) term of the contract between them.

It is true that the United State Supreme Court suggested over a century ago that a law partner who winds up the business of a dissolved firm might owe his former partners a different duty when the firm handled cases on a billable hours basis rather than on contingency:

> there is a suggestion in Denver v. Roane, that there may be "a different rule in cases of winding up partnerships between lawyers and other professional men, where the profits of the firm are the result solely of professional skill and labor."

> This point is not involved, and on it no ruling is made, because we are not dealing with questions between the administrator of the deceased and the surviving member of an ordinary law partnership, where the latter conducts to a conclusion the business of the firm, *under circumstances where there may be a right from time to time to call on the client for compensation for the value of services rendered, and even though the case is finally lost.* Here the agreement related

solely to litigation in which compensation was for success, and not for the value
of services rendered. Such payment was to be *in solido*, and the partners agreed
that the fees should be divided *in solido*.

Consaul v. Cummings, 222 U.S. 262, 271 (1911) (internal citation omitted) (emphasis added).

However, the Court quite explicitly did not decide the matter. And when the Partnership Law

was adopted some years later, its draftsmen did not accept the High Court's invitation either to

treat law partnerships differently than other partnerships, or to draw a distinction between

professional services contracts where services are billed as rendered rather than being dependent

on the matter's outcome.

Furthermore, Consaul says nothing at all about whether client matters that are billed by

the hour are or are not assets of the law firm that is retained to handle them; if anything, it

suggests that they are assets, because a partner's duty to account (which is what the court was

discussing) would not be triggered otherwise.

> ## ii. New York public policy would lead the Court of Appeals to apply the
> ## rules differently than other UPA states have

The Firms argue that the Court of Appeals would not follow the other UPA jurisdictions,

which have concluded that client matters billed by the hour are presumptively partnership assets,

because the imposition of a duty to account on former law partners who finish such client matters

would be contrary to New York public policy. This is by far the Firms' most powerful argument.

However, it, too, fails in the end.

The Firms rely on New York's strong commitment to the policy of client choice of

attorneys. They argue that the Court of Appeals would reject application of the unfinished

business doctrine to billable hours matters because it would lead to a financial disincentive to an

attorney's continued representation of her client. Other UPA jurisdictions have acknowledged

that a policy favoring unfettered client choice of counsel might indeed conflict with the

35

application of the unfinished business doctrine; but in the end, all but one of those states have

concluded that the unfinished business doctrine does not run afoul of this public policy. See

Jewel, 156 Cal. App. 3d at 178; Resnick, 49 Md. App. at 509; Ellerby, 138 Ill.App.3d at 81; but

see Welman v. Parker, 328 S.W.3d 451, 457 (Mo. App. S.D. 2010) (application of the unfinished

business doctrine and no compensation rule to law partnership "would unduly impinge upon the

client's perceived freedom to change attorneys without cause and could have a chilling effect

upon the choice of that option by the client"); see also *Comment, Winding Up Dissolved Law

Partnerships: The No-Compensation Rule and Client Choice*, 73 Cal. L. Rev. 1598 (1985).  New

York, however, has gone further than other jurisdictions to protect client autonomy and attorney

mobility.  That, say the Firms, argues for a different answer to the question.

It is true that New York goes out of its way to protect a client's right to select counsel of

its choosing.  Most conspicuously, New York courts have overridden the usual rule that partners

may arrange their internal affairs as they please by refusing to enforce provisions in partnership

agreements that might create a financial disincentive for a partner to continue representing a

client of his former firm.  For example, in Cohen v Lord, Day & Lord, 75 N.Y.2d 95, 96 (1989),

the Court of Appeals held:

> A law firm partnership agreement which conditions payment of earned but
> uncollected partnership revenues upon a withdrawing partner's obligation to
> refrain from the practice of law in competition with the former law firm restricts
> the practice of law in violation of [New York Rules of Professional Conduct 5.6]
> and is unenforceable in these circumstances as against public policy.

Cohen had been a partner with the firm Lord, Day & Lord, for nearly 20 years.  He signed the

firm's partnership agreement, which gave a withdrawing partner a departure payment equal to the

partner's interest in accounts receivable and fees earned but unbilled on the date of withdrawal,

payable over three years.  However, this payment would be forfeited if the partner entered into

36

competition with the firm after withdrawal. Id. at 97. A partner who continued to practice law in any state or other jurisdiction where Lord, Day & Lord maintained an office or in any contiguous jurisdiction, was entitled only to a settling of his capital account. Cohen went into practice elsewhere after leaving Lord Day, and sued his former firm for the full departure payment. The firm raised this forfeiture provision as a defense.

The Court of Appeals ruled that the forfeiture provision was void as contrary to public policy – not because it was harmful to the lawyer, but because it might have proven harmful to a client. Because "The forfeiture-for-competition provision would functionally and realistically discourage and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel," the Court held that it ran afoul of the provision of the professional ethics rules (now embodied in Rule 5.6) that prohibits restraints on the practice of law. Cohen, 75 N.Y.2d at 98.[7]

The Court of Appeals explained that "The purpose of the rule is to ensure that the public has the choice of counsel." It discussed several ethics opinions, including one from the New York County Lawyer's Association, that had concluded such agreements were unethical, because: "Clients are not merchandise. Lawyers are not tradesmen. They have nothing to sell but personal service. An attempt, therefore, to barter in clients, would appear to be inconsistent with the best concepts of our professional status." Cohen, 75 N.Y.2d at 98.

Therefore, to the extent that restrictive covenants keep lawyers from representing particular clients, they are inconsistent with unfettered client choice, and so are void as violative of New York public policy. This is so whether the restrictive covenant takes the form of an

---

[7]     Under Rule 5.6, "A lawyer shall not participate in offering or making . . . a partnership . . . agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement."

outright ban on practice or simply creates a financial disincentive for the lawyer to continue representing his clients of his former firm, as did the forfeiture provision at issue in Cohen. Id. at 99-100 (relying on Matter of Silverberg (Schwartz), 75 A.D.2d 817, 819 (2d Dep't 1980)). The Court of Appeals rejected the notion, espoused in the dissent, that a financial disincentive for the withdrawing lawyer to continue a representation is irrelevant to the client's free exercise of choice. Cohen, 75 N.Y.2d at 99; compare id. at 107-08 (Hancock, J., dissenting).

The Firms argue that the application of the unfinished business doctrine[8] where cases are billed by the hour will create the same sort of "financial disincentive" for the former partners of dissolved firms to continue representing their clients that the New York Court of Appeals condemned in Cohen. Specifically, when a partner realizes that he and his new firm will be required to perform 100% of the ongoing work, but will have to account for his profit and share a large percentage of it with his former partners, he will prefer to withdraw from the representation – even though his client at the former firm may wish him to continue.

This argument has been made before, and has been rejected by most UPA jurisdictions.

For example, the California Supreme Court has observed:

> in some respects, the "no-compensation rule" of partnership law, whereby departing partners are compensated for winding up the unfinished business of the partnership according to their partnership interest, may be just as much a disincentive on the withdrawing partner to continue to represent clients of the firm as an anticompetitive penalty.

Howard v. Babcock, 6 Cal. 4th 409, 424 n.8 (1993). Yet in Jewel the California appellate court reasoned that:

> the right of a client to the attorney of one's choice and the rights and duties as between partners with respect to income from unfinished business are distinct and do not offend one another. Once the client's fee is paid to an attorney, it is of no

---

8       The Firms' argument is equally applicable to the application of the "no compensation rule," which is discussed further below. It is no more persuasive in that context.

concern to the client how that fee is allocated among the attorney and his or her former partners.

156 Cal. App. 3d at 178. However, that plainly is not the law in New York; that very argument (that it is all the same to the client how the fee gets divided once it is paid) was made by Judge Hancock in dissent, 75 N.Y.2d at 107-08 (Hancock, J., dissenting), and rejected by the majority in Cohen, 75 N.Y.2d at 99-100.

The strongest case for the Firms' position is, ironically, one they fail to cite – Denburg v Parker Chapin Flattau & Klimpl, 82 N.Y.2d 375 (1993). There, the New York Court of Appeals struck down, as an illegitimate financial disincentive to the practice of law, a provision of a partnership agreement that required a departing partner who competed against her former firm to pay the firm the greater of (i) 12.5% of the firm's profits allocated to the partner over the two previous years or (ii) 12.5% of the annual bills by the new firm to former Parker Chapin clients over the ensuing two years. The Court of Appeals believed that this requirement illegally infringed on a client's right to choose to give her business to a new firm:

> As we made clear [in Cohen], restrictions on the practice of law, which include "financial disincentives" against competition as well as outright prohibitions, are objectionable primarily because they interfere with the client's choice of counsel: a clause that penalizes a competing attorney by requiring forfeiture of income could "functionally and realistically discourage" a withdrawing partner from serving clients who might wish to be represented by that lawyer.

Id. at 380 (quoting Cohen, 75 N.Y.2d at 98). The Court observed that the forfeiture provision created a disincentive for a departing partner to continue representing a client of his former firm, even if the client preferred to retain her, because retaining a client of the former firm required a forfeiture of a portion of profits for work done subsequent to her departure from Parker Chapin. Denburg, 82 N.Y.2d at 381.

39

_Denburg_ helps the Firms in a couple of ways.  First, along it with _Cohen_, it supports the proposition that, under New York law, *any* financial disincentive to a lawyer's continuing to represent a client impinges on that client's choice of counsel ability to select counsel of his choice.

But more important is the similarity between the financial disincentive found repugnant to public policy in _Denburg_ and the practical effect of the unfinished business doctrine and no compensation rule in these cases.  In _Denburg_, if a departing partner competed against her former firm by continuing to represent a client whose business once had been the property of the firm, she was obligated to share her fees with her former partners.  Here, if DSI prevails, a withdrawing partner who completed an unfinished Coudert representation at a new firm will have to share 100% of the profits realized on that representation with her former Coudert partners.

However, the matter is not quite so simple.

First, _Denburg_ and _Cohen_ are not dissolution cases; they involve the withdrawal of one partner from a partnership that continued in business rather than winding up.  The rules for partnerships in dissolution are very different, and significantly are set by statute.  See Partnership Law Art. 6 (Dissolution and Winding Up).  When a partnership does not dissolve despite the death or withdrawal of a partner, as was the case in _Denburg_ and _Cohen_, the default provisions of the Partnership Law are not implicated.  It would be difficult indeed to conclude that the Partnership Law provisions that impose and measure the duty of partners to wind up existing firm business for the benefit of the dissolved firm, adopted as they were by the Legislature, violate public policy.  See Partnership Law §§ 40(6), 43(1), 73.

40

Second, _Denburg_ and _Cohen_ involved situations where a partner was competing with his or her former partners for the custom of the same client.  Here there is no question of competition – only of whether the Former Coudert Partners have a continuing duty to account for profits earned on business that originated at Coudert – which has gone out of business – and must be finished elsewhere.

Third, _Cohen_ has nothing to do with the unfinished business doctrine, and _Denburg_ does not specifically address unfinished business.  The fee-sharing provision in the Partker Chapin partnership agreement required the departing partner to share profits earned on *new* business from former clients of Parker Chapin – in effect, treating the *client*, not the *matter*, as the firm's property.  Therefore, even if it had arisen in the context of dissolution, _Denburg_ could be read as holding only that a provision that required a departing attorney to share fees on *new business* involving her former firm's clients was contrary to public policy, because it restricted the client *even after* any unfinished representation was wound up.  Accounting for profits earned on unfinished business, on this reading, would simply be an unexceptional application of the Partnership Law.[9]

For all these reasons, it would be unwise to extrapolate too much from _Denburg_ and _Cohen_.

Ultimately, the reason I do not believe _Denburg_ or _Cohen_ mandates the result argued for by the Firms is that accounting for profits in a contingent fee case creates exactly the same type of financial disincentive for a former partner to finish business begun at a former firm.  But the "financial disincentive" rationale underlying _Cohen_ and _Denburg_ has never been held by a New York court to undermine the unfinished business rule in contingent fee cases post-dissolution.

---

[9]     Unfortunately, it is not clear from the Court of Appeals' opinion whether the partnership agreement's non-competition provision was meant to apply only to new business.

This argues strongly in favor of restricting the rule of the non-competition cases to situations where lawyers and their former firms are in fact competing for new business from the same client.

It is significant that the Second Circuit never mentioned Cohen or Denburg, or any other non-competition case, in Santalucia v. Sebright Transp., Inc., 232 F.3d 293 (2d Cir. 2000), where it adopted the Appellate Division rule that contingency fee cases pending on the date of dissolution are partnership assets subject to distribution in the absence of a contrary agreement. There, a dissolved law firm sued its departed partner, Premo, to account for profits he earned winding up one of the contingency fee cases that was pending at the firm on the day it dissolved. District Judge Hurd limited the firm to a quantum meruit recovery for the value of its pre-dissolution work. He was reversed on appeal.

> To date, the New York Court of Appeals has not addressed the more specific issue of when and to what extent a lawyer has a fiduciary duty to account to a dissolved firm for the contingent fee cases that he took with him. However, New York's Appellate Division has confronted the problem on several occasions. Those cases now uniformly hold that, "absent an agreement to the contrary, pending contingent fee cases of a dissolved partnership are assets subject to distribution.

Id. at 297-98 (citations omitted). The Second Circuit expressed no concern that permitting the dissolved firm to participate in Premo's post-dissolution earnings might impinge on his client's right to an unfettered choice of counsel.

The Firms will undoubtedly argue that Santalucia should not be extended to the billable hours context. But there is no logical reason why, as a public policy matter, the rule ought not be the same for any pending legal representation that remains unfinished when the law firm handling it dissolves – regardless of how it is billed. Where the presumed deterrent effect on the client's ability to retain the lawyer of his choice is exactly the same, no matter how the case is

billed, it makes no sense to hold that imposing on a former partner the duty to account for profit realized on a billable hours case that originated at her now-dissolved law firm violates public policy, but imposing the identical duty when the case was handled on contingency does not. The desire to protect client choice in selecting counsel may well augur for adopting a rule that *no* unfinished legal representation is an asset of a dissolved law partnership (as opposed to any other type of professional services partnership). But as long as Santalucia remains good law in this Circuit – and I suspect that it will until the New York Court of Appeals finally weighs in on this issue – I am not free to embrace such a rule.

Thus, I believe that if faced with the issue, the New York Court of Appeals would apply the same rule to hourly billed cases as its Appellate Divisions apply to contingency fee cases: they are unfinished business assets subject to distribution unless a contrary intention appears.

### 2. *The Coudert Partnership Agreement does not indicate a contrary intention*

The Coudert Partnership Agreement does not suggest that client representations billed by the hour should not be treated as Coudert's assets. On the contrary, it specifically states that all the property of the firm belongs to the firm, not the individual partners. Article 8(i) sets forth the nature of each partner's interest in Coudert:

> The property of the Partnership belongs to the Partnership, and not to the Partners, and a Partner has no individual property rights in any specific assets of the Partnership. Rather, each Partner's interest in the Partnership property is his or her share in the surplus after the Partnership debts are paid and the Partnership accounts are settled and the rights of the Partners are adjusted between themselves.

(CPA Art. 8(i).) The Agreement does not specify that the Client Matters are *not* property of Coudert, so under Stem and Shandell, they are property of the firm.

43

If there were any doubt that Coudert partners thought their client matters were firm

property, the Special Authorization that the partners passed to allow the Executive Board to wind

up the firm dispels it:

> The Equity Partners . . . hereby authorize the Executive Board . . . to take such
> actions as it may deem necessary and appropriate, including, without limitation,
> the granting of waivers, notwithstanding any provisions to the contrary in the
> Partnership Agreement . . ., in order to:
>
> a.      . . . sell all or substantially all of the assets of . . . the Firm to other firms or
> service providers, in order to maximize the value of the Firm's assets *and*
> *business*;
>
> b.      wind down the business of the Firm with a view to continuing the
> provision of legal services to clients and the orderly transition of client matters to
> other firms or service providers, *in order to maximize the value of the Firm's*
> *assets and business to the extent possible* . . . .

(Keefe Decl., Ex. A, at 76 (emphasis added).)  The winding up partners are specifically

instructed "to maximize the value of [Coudert's] assets and business" by "transition[ing]" to other

firms the "continuing . . . provision of legal services to clients."  Plainly, the drafters of this

authorization thought that client matters were firm business for which provision needed to be

made – for the clients, and to maximize their value to Coudert in dissolution.  The language of

the Authorization does not distinguish between contingency and billable matters, which is hardly

surprising, since and informed observers of the New York City big firm market would be

surprised if Coudert had a large book of contingency business.

Thus, the Coudert Partnership Agreement and the Special Authorization only confirm the

law's presumption that executory contracts to perform legal services are property of the

partnership, for which partners who bring them to a conclusion upon dissolution have a duty to

account.

44

Neither does the Coudert Partnership Agreement do anything to forestall the application

of the default rules of the Partnership Law, including the duty to account for profits earned on

unfinished business after dissolution. In fact, the Coudert Partnership Agreement *calls explicitly*

*for the application of the Partnership Law's default dissolution rules if the firm dissolves*:

> (a).    Dissolution. The Partnership may only be dissolved and wound up by an
> affirmative vote of a Super Majority of the Executive Board . . . and an
> affirmative vote of the Equity Partners . . . . Such dissolution and winding up,
> *and the rights of the Partners in connection therewith*, shall be governed by the
> provisions of the Act.

(CPA Art. 10(a) (emphasis added).) Article 1 defines the "Act" as the New York Partnership

Law. (CPA Art. 1.)

The Firms point to the second sentence of Article 10(b) of the Coudert Partnership

Agreement, which provides:

> In the case of any persons who shall have been Equity Partners at the time of such
> termination or dissolution of the Partnership . . . each such person shall be entitled
> to receive from the Partnership . . . those payments provided for pursuant to
> Article 6(k) and Article 11 . . . as though such person had Withdrawn
> involuntarily upon the day preceding such termination or dissolution of the
> Partnership.

(CPA Art. 10(b) (paragraph break added).) This provision says that any Coudert partner still

with the firm on the date it dissolves is entitled to certain payments, and explains how those

payments will be calculated (as though the partner had withdrawn the day before dissolution). It

says nothing about assets, unfinished business, or the firm's right to an account from those

partners if unfinished client business is finished by a former partner after dissolution.

The Firms argue that this provision either waives Coudert's right to participate in the

profits the Former Coudert Partners earned post-dissolution, or operates to settle all of the

accounts between the Former Coudert Partners and Coudert – much as the continuation

provisions of Articles 3 and 11 would have if Coudert had not dissolved. But I do not read this

45

sentence to do either. It only describes the amount of money to which former Coudert partners who remained partners on the Dissolution Date are entitled to collect from the firm (or its Estate) in the dissolution process – nothing more. I thus read it to override Partnership Law § 73, which sets the default rule for settling accounts with partners who withdraw after dissolution. Interpreting this sentence otherwise than in accordance with the plain meaning of its words would undermine the applicability of the Partnership Law to Coudert's dissolution process "and the rights of the Partners in connection therewith," in direct contradiction of the Coudert Partnership Agreement. (See CPA Art. 10(a).)

Thus, because the Client Matters belonged to Coudert on the Dissolution Date, and because the Coudert Partnership calls for the application of the Partnership Law to determine the post-dissolution rights of the partners, the Former Coudert Partners have a duty to account for profits they earned completing the Client Matters at the Firms. If Coudert had wished it otherwise, the firm could have drafted its Partnership Agreement differently. It did not. As a result, DSI is entitled to a declaration that the Client Matters were Coudert's property on the Dissolution Date.

## B. The Only Way to Decide Whether the Unfinished Business Has Value Is to Have an Accounting.

As a fall back, the Firms argue that they are entitled to summary judgment even if the Client Matters are assets, because those assets have no value. They argue that all the post-dissolution profits to which Coudert might otherwise be entitled are attributable to the Former Coudert Partners' post-dissolution "efforts, skill and diligence" – which, when deducted from the fees earned by the Firms, leaves nothing of the fees they were paid for handling the Client Matters to remit to Coudert.

46

That is not at all apparent.

As a general matter, a partner making his accounting may deduct expenses from gross fees and remit the net fees, i.e., profits, to his former partners for division.  As discussed above, under the no compensation rule, "expenses" are not supposed to include compensation for the partner's post-dissolution efforts – however extraordinary those efforts may be.  Other UPA states enforce this rule rigidly, even when the result is harsh – as, for example, when a departing partner takes a matter from the dissolving firm shortly after its inception and achieves an extraordinary result almost entirely through his efforts at a new firm.  See, e.g., Ellerby, 138 Ill.App.3d at 83; In re Labrum, 227 B.R. at 418-19 (applying Pennsylvania law); see also LaFond, 2012 WL 5033655, at *10.

In an apparent effort to ameliorate so "unfair" as result, New York cases that discuss the unfinished business doctrine in the context of law firm contingency fee cases calculate expenses differently than do courts in other UPA jurisdictions.  Cases like as Kirsch and Shandell do not allow the former firm to participate in any "value" the case yields as a result of the accounting partner's post-dissolution "efforts, skill and diligence."  Their rationale is that, under Partnership Law § 73, any such additional "value" is not "attributable" to the accounting partner's "use" of the partnership property, but solely to the former partner's own efforts.  See Partnership Law § 73 (entitling a deceased or retiring partner to "an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option . . . in lieu of interest, *the profits attributable to the use of his right in the property of the dissolved partnership*.") (emphasis added).  This rule – which has so far only been applied in the context of law partnerships – in effect treats the value of the partner's "effort, skill and diligence" as an expense that can be added to the deduction from overhead, not as compensation to the partner.  The Kirsch rule has been applied by three of the

47

four Appellate Divisions, and by the Second Circuit in <u>Santalucia</u>. 232 F.3d at 293; <u>see also</u>
<u>Shandell</u>, 217 A.D.2d at 417 (1st Dept); <u>Murov</u>, 12 A.D.3d 654 (2d Dept); <u>Kirsch</u>, 181 A.D.2d at
222 (3d Dept).

The New York Court of Appeals has never addressed whether this deduction is or is not
consistent with the Partnership Law's "no compensation" rule. I question whether that court, if
squarely confronted with the issue, would endorse the result reached by the intermediate
appellate courts. As far as I can discern, the distinction between profits "attributable" to the
"use" of a firm asset and profits attributable to the accounting partner's "post-dissolution efforts,
skill and diligence" is non-existent. Imagine a law partnership consisting of Abbey and Bob.
They agree to dissolve. Because they are both alive, neither is a "surviving partner" entitled to
extra compensation under Partnership § 40(6). <u>See</u> <u>Geist</u>, 19 N.Y.S.2d at 76. Only one case
ispending on the date of dissolution. Abbey completes it, thereby winding up the business of the
old partnership. Bob demands an accounting for his share of the profits. Applying <u>Kirsch</u>,
Abbey gets to withhold from the gross fees (1) her expenses in winding up the case, and (2) an
amount representing her "effort, skill and diligence" in winding up the business. But Abbey's
retention of the latter amount, to reward her post-dissolution efforts, runs directly contrary to the
rule that governed in cases like <u>Stem</u>, <u>Rhein</u>, and <u>Geist</u>. In <u>Rhein</u> the court spoke plainly: the
departing partner was required to remit the contracted fee, less his expenses, *without any*
*compensation for his post-dissolution efforts, skill and diligence.*

<u>Rhein</u> involved a dental partnership, not a law firm, but it is hard to see why dentists, or
architects, or the lawyers that were denied reasonable compensation in <u>Geist</u>, should be treated
differently (and worse) than lawyers are under the Partnership Law.[10] How else, other than by
expending her "efforts" to bring it to a successful conclusion, could Abbey have "used" an

---

[10]     Except, of course, that lawyers write the rules.

unfinished client matter that properly belong to the firm of Abbey and Bob?  Assets like client

matters do not yield profits simply by sitting on the shelf, so trying to distinguish between

"using" a firm asset to generate profits, and putting "efforts, skill and diligence" into generating

those profits makes little sense.  The distinction appears to be purely semantic – a clever way of

exempting law practice from the common law and UPA "no compensation" rule, despite the

evident intent of the Legislature not to do so.

Moreover, when determining the "value" of an unfinished contingent fee case as of the

date of dissolution – as the court must, in order to determine Bob's entitlement to share in the

settlement proceeds – courts following Kirsch and Santalucia are required to examine factors that

make Bob's recovery depend on quantum meruit, rather than the partnership law's presumption

that a partner is entitled to his or her contractual share of the profits in the partnership business.

Grant, 263 A.D.2d at 389 ("the Referee must evaluate *the efforts undertaken by the former law*

*firm prior to dissolution date*, or any other relevant evidence to form a conclusion as to the value

of these cases to the law firm on the dissolution date.") (emphasis added).  To the extent that the

New York rule calls for Bob to get the net fees less the value of Amy's efforts, Bob's recovery

will invariably approximate what he would recover under quantum meruit principles –

notwithstanding the ostensible "rejection" by the New York appellate courts of quantum meruit

as the measure of a former partner's right to recovery from whatever partner finishes a matter

pending upon dissolution.

The result in cases like Kirsch and Shandell eviscerates the "no compensation" rule.  In

fact, the "efforts, skill and diligence" rule appears to read that provision right out of the statute, in

contravention of the Legislature's intent, as plainly expressed in Partnership Law § 40(6).

Furthermore, the case on which Kirsch relies – Bader v. Cox, 701 S.W.2d 677 (Tex. App. Dist. 5

1985), involved what was considered a "surviving" partner, who is therefore expressly entitled to compensation under the UPA's modification of the no compensation rule. <u>Bader</u>, in turn, relies on <u>Timmermann v. Timmermann</u>, 272 Or. 613, 538 P.2d 1254 (1975) (en banc), which appears to embrace the rule that *any* partner who winds up firm business is entitled to compensation, even if she was not forced to do so by the death of her partner. But in New York and elsewhere, Partnership Law § 40(6) has been interpreted to allow compensation only to partners who wind up the partnership affairs following dissolution caused by death. <u>See</u> <u>Geist</u>, 19 N.Y.S.2d at 76. So <u>Kirsch</u> (which did not involve a dissolution caused by death) looks to me like it rests on a misapplication or misunderstanding of Partnership Law § 40(6), because in that case, where two living partners agreed to go their separate ways, there was no "surviving" partner.

Finally, the great weight of authority in UPA jurisdictions is against the <u>Kirsch</u> rule. <u>See, e.g.,</u> <u>Ellerby</u>, 138 Ill.App.3d at 83 ("[P]rior to the distribution of any profits, each partner is entitled to be reimbursed for the reasonable and necessary overhead expenses attributable to winding up the partnership's business," and nothing more); <u>Jewel</u>, 156 Cal.App.3d at 180 ("Under the provisions of the Uniform Partnership Act, the former partners will be entitled to reimbursement for reasonable overhead expenses (*excluding partners' salaries*) attributable to the production of post-dissolution partnership income.") (emphasis added); <u>In re Labrum</u>, 227 B.R. at 418-19 (same) (applying Pennsylvania law); <u>see also</u> <u>LaFond</u>, 2012 WL 5033655, at *10 ("The great majority of states have concluded that contingent fees ultimately generated from cases that were pending at the time of dissolution of a law firm must be divided among the former law partners according to the fee-sharing arrangement that was in place when the firm dissolved."); <u>but cf.</u> <u>Bader v. Cox</u>, 701 S.W.2d 677 (Tex. App. Dist. 5 1985) (embracing "efforts, skill and diligence" rationale).

For all these reasons, I entertain serious doubts whether the New York Court of Appeals would adopt the rationale of cases like Kirsch and Shandell, either in the contingency fee context or in the billable hours context.

The Second Circuit, however, has applied the rule, to a law firm, in the contingency fee context, Santalucia, supra. This court is bound by that decision. For the reasons discussed at length at pages 20 to 42 above, I can see no justification for imposing a different and harsher rule in a billable hours case than in a contingency case. In fact, adopting the rule in the billable hours context undermines even more clearly the purported repudiation of the quantum meruit rationale for unfinished business cases.

Thus, while I doubt whether the New York Court of Appeals would apply Kirsch in *either* context, I feel constrained to apply Santalucia to billable hours cases as well. The situation needs sorting out, but that is ultimately a job for the New York Court of Appeals.

Applying the rule set forth in Santalucia does not, however, obviate the need for a trial. Disputed issues of fact remain concerning both the "value" of the Client Matters on the Dissolution Date, which will be determined, at least in part, by valuing the Formers Coudert Partners' post-dissolution efforts, skill and diligence.

Lest there be any doubt: this Court cannot blithely assume that the profits attributable to the Former Coudert Partners' post-dissolution "efforts, skill and diligence" are equal to the profits realized by the Firms for completing the Client Matters. One only need to look to Santalucia itself to reach this conclusion. After reversing Judge Hurd on the application of quantum meruit to the valuation question, the Second Circuit did not direct that he enter a judgment of zero in favor on the dissolved law partnership; it remanded so that Judge Hurd could

51

make findings of fact about both the value of the wrongful death case on the date of dissolution and the departing partner's post dissolution "efforts, skill and diligence." Id. at 299-300.

This Court is currently in no position to make factual findings about any of the following: the value of the Client Matters on the Dissolution Date; the amount of post-dissolution profits (amounts collected minus expenses incurred) attributable to the Former Coudert Partners' "use" of the Client Matters, for which the Former Coudert Partners have a duty to account; or the amount of the post-dissolution profits that can be attributed to the Former Coudert Partners' post-dissolution "efforts, skill and diligence," which I must deduct from the profits as directed by Santalucia. Resolving those issues raises new questions that go far beyond the bounds of this opinion, including the following:

> (1) The Partnership Law requires the departing partner to account for profits he realizes from the use of the dissolved firm's unfinished business. Is that measured by his share of the new firm's profit on the matter, or by the entire profit realized on the matter?
>
> (2) What constitutes a deductible "expense" or "overhead" at the new firm? What portion of the new Firm's realized fee is profit and what is expense (which will entail dissection of billing rates to tease out the profit factor from the cost factor)?
>
> (3) How does one value the Former Coudert Partner's contribution of "effort, skill and diligence" to the matter?

I am disinclined to ruminate on these issues; I look forward to the thorny task of resolving them.


C. Disposition of summary judgment motions

DSI's cross-motion for summary judgment seeks a declaration that the Client Matters were Coudert's property on the Dissolution Date, as a matter of law. DSI has demonstrated its entitlement the declaration it seeks, as a matter of law. The Firms have failed to adduce evidence creating a disputed issue of fact concerning the parties' intent. Thus, DSI's cross-motion for a

declaration to the effect that the Client Matters were Coudert property on the Dissolution Date, triggering the Former Coudert Partners' duty to account, is GRANTED.

The Firms' motions for summary judgment dismissing the complaints are DENIED as to the claims for an accounting. The Former Coudert Partners' duty to account to Coudert arose as they completed the Client Matters and earned fees thereon, and these actions were within the scope of the business of the Firms they joined. Thus, the Firms are jointly liable for an accounting, and there is no need to join the Former Coudert Partners individually under Federal Rule of Civil Procedure 19.

The Firms' motions are GRANTED as to DSI's remaining claims, which are dismissed, without prejudice, as duplicative and unnecessary. All the rights and obligations of the parties will be settled in an accounting proceeding. No basis for damages beyond remitting of the profits, less deductions, has been identified either in the pleadings our on the record of this motion. Should discovery reveal such a basis, DSI can move to have its remaining claims reinstated.

As noted above, Defendant Akin Gump avers that it has only represented former Coudert clients on new business, unrelated to any unfinished business. It is free to move for summary judgment once DSI has had discovery on the issue.

D. Certification

I have received some indication that the Firms will want to move for certification and an interlocutory appeal under 28 U.S.C. § 1292. They are ordered to do so within 10 days. DSI's response due 7 days thereafter. I will not need reply papers.

As the foregoing no doubt demonstrates, I respectfully disagree with my distinguished colleague, the Hon. Victor Marrero – who denied an interlocutory appeal from Judge Drain's order denying the Firms' motion to dismiss, In re Coudert Bros. LLP Law Firm Adversary Proceedings, 447 B.R. 706 (S.D.N.Y. 2011) – about the complexity and difficulty of the issues involved in this case.  The Firms' motion should explain why the current, and very different, posture of the case as it stands before me should lead me to analyze the remaining statutory elements differently than Judge Marrero.

## V.  CONCLUSION

The Clerk of Court is directed remove the following open motions from the Court's list of pending matters: 11 Civ. 5968 (ECF #s 13, 22); 11 Civ. 5969 (ECF #s 15, 24); 11 Civ. 5970 (ECF #s 13, 22); 11 Civ. 5971 (ECF #s 14, 23); 11 Civ. 5972 (ECF #s 13, 23); 11 Civ. 5973 (ECF #s 14, 25); 11 Civ. 5974 (ECF #s 14, 24); 11 Civ. 5983 (ECF #s 19, 28); 11 Civ. 5984 (ECF #s 15, 24); 11 Civ. 5985 (ECF #s 13, 21); 11 Civ. 5993 (ECF #s 12, 21); 11 Civ. 5994 (ECF #s 15, 25); 11 Civ. 5995 (ECF #s 13, 22).

Dated: May 24, 2012

U.S.D.J.

BY ECF TO ALL PARTIES